UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                          CRIMINAL ACTION NOS. 2:05-00107-01
                                                 2:05-00107-02

GEORGE LECCO and
VALERIE FRIEND

MEMORANDUM OPINION AND ORDER

Pending is defendants' joint motion for a new trial ("second new trial motion") regarding juror William Griffith.[1]

On May 23, 2007, twelve days after the jury returned its verdict finding the defendants guilty on all counts, and following closing arguments concerning the appropriate sentence, but prior to the sentencing hearing jury instructions by the court, the United States disclosed a contact that occurred that morning between a special agent of the Federal Bureau of Investigation ("FBI") and Griffith.  On May 29, 2007, the jury unanimously found that sentences of death were appropriate as to each of the two counts for which it was sought.

---

[1]The first new trial motion is addressed in a separate written opinion and order entered November 27, 2007.

Defendants now seek a new trial based upon Griffith's alleged misconduct, including his failure to answer numerous questions on the juror questionnaire truthfully and, in particular, his failure to reveal that he was under federal investigation for child pornography.  The evidentiary hearings relating to the motion concluded on February 4, 2008, with the parties' post-hearing merits briefing concluding May 1, 2008. The matter is ready for disposition.

I.

On November 27, 2002, Griffith came to the attention of Special Agent (S/A) Jeffrey Franks of the FBI after S/A Franks received a referral from the National Center for Missing and Exploited Children ("Center") in Alexandria, Virginia.  (Offic. File of FBI at 107).

Two complaints to the Center, one anonymous and one from an identified person, accused Griffith of, inter alia, producing child pornography.  (Id. 107-08).  On or about December 5, 2002, an alleged victim, then approximately 18 years old, was interviewed by S/A Franks and United States Postal Inspector Tom Svitek.  (Offic. File of Spec. Agent at 159; Offic. File of FBI

2

at 109).  The individual stated, <u>inter alia</u>, that, at a time when he was approximately 14 years old and working as a male prostitute, he was picked up by Griffith, who allowed him to stay at his residence.  (Offic. File of Spec. Agent at 159).  The individual alleged that he observed controlled substances in the home and "felt like he had no choice" but to engage in sexual activity with Griffith, who would otherwise "require him to leave" the home.  (<u>Id.</u> at 159-60).

The individual resided with Griffith for approximately two weeks on one occasion and for approximately one month on another.  (<u>Id.</u> at 160-61).  During his first stay with Griffith, the individual described computer equipment in the home.  (<u>Id.</u> at 160).  He recounted seeing electronic, video, and conventional images that appeared to contain child pornography, some of which involved "images of children in the age range of seven to 15 years old."  (<u>Id.</u>)  During the second stay, he again claimed to see what appeared to be child pornography on the computer.  (<u>Id.</u> at 160).  During that second stay, Griffith also allegedly took approximately seven pictures of the individual, one of which depicted him completely nude.  (<u>Id.</u> at 161).  The individual's genitals were in view in all of the pictures.  (<u>Id.</u>)  The individual stated that Griffith transferred the images to the C:

drive on his computer, made electronic copies of them, and sent at least one picture to two other individuals.  (Id.)

Apparently at some time in early December 2002, S/A Franks discussed the matter with an Assistant United States Attorney ("assigned AUSA"), who agreed to prosecute the case if the allegations were substantiated.  (Id. at 36; see Not. of Filing of Part. Unredac. Interv. Summs., Ex. B at 1 (S.D. W. Va. Feb. 28, 2008) ("Int. Summs.")).[2]  On December 10, 2002, S/A Franks submitted a 25-page affidavit to a United States Magistrate Judge seeking a search warrant for Griffith's home. (Offic. File of FBI at 82, 88, 92).  The warrant listed as sought-after fruits, inter alia, any visual depictions of minors engaged in sexually explicit conduct.  (Offic. File of FBI at 85).  The magistrate judge issued the warrant the same day. (Id. at 84).  The return indicates that on December 11, 2002, following an approximate 2.5 hour search involving 11 federal and state law enforcement officers, 27 items, some with multiple parts, were seized at Griffith's residence.  (Id. at 86, 26).

---

[2]The Interview Summaries were a device jointly agreed upon by the parties as a means of expeditiously developing a stipulated evidentiary record concerning how certain employees of the United States involved in the Griffith investigation would respond if called upon to testify at an evidentiary hearing.  The interviews appear to have been conducted in January 2008.

The seized items included a "[p]hoto of [a] nude boy."  (<u>Id.</u> at 86).

Griffith was interviewed the same day by S/A Franks and Inspector Svitek after being provided <u>Miranda</u> warnings.  (Offic. File of the FBI at 25, 31; 12/18 Trans. at 85).  A December 11, 2002, memorandum of interview prepared by Inspector Svitek reflects that Griffith stated "he had nothing to hide and that he had no problems with investigators searching his residence . . . ."  (Offic. File of FBI at 31).  Griffith effectively denied that he had any child pornography in his possession or any involvement with child pornography.  (<u>Id.</u> at 25, 31).  Specifically, he stated "'There's no child pornography anywhere that I know of" and explained "'someone[, presumably a houseguest,] could have just downloaded it.'"  (<u>Id.</u> at 31).  He then stated that "people may send pictures [via the [[I]nternet] of a person 'maybe 15 or 16 years old' . . . and that 'mostly I'll just delete them.'"  (<u>Id.</u> at 32).

Griffith then told S/A Franks and Inspector Svitek as follows: "You're really making me nervous.  I'm not a child molester or pornographer."  (<u>Id.</u>)  He additionally stated that there was a "'very, very, very slim chance . . . . less than a 1%' chance that his computer contained child pornography."

5

(<u>Id.</u>).  He then "admitted[,] however, there . . . [was] a
'possibility' he downloaded images of post-pubescent 'kids maybe
15' years old . . . .  [b]ut that he thought 'Oh, looks kind of
young."  (<u>Id.</u> at 33).  He additionally admitted his use of
cocaine previously but claimed he had not used it "for 'a couple
of years.'"  (<u>Id.</u> at 25).

        The December 11, 2002, memorandum of interview
additionally reflects that Griffith "denied ever taking pictures
of kids or that kids were ever in his house, replying 'never,
never' when questioned." (<u>Id.</u> at 31, 32 ("I've never taken
pictures of kids.")).  Later in the interview, he  "admitted to
taking pictures of . . . [an individual], who was 17 at the
time[]," suggesting the individual "'wanted me to take pictures
so he could send them to others over the [I]nternet.'" (Int.
Summs., Ex. G at 2; Offic. File of FBI at 32).  Regarding this
same individual, Griffith later stated in the interview that "he
took two or three but that . . . [the individual] took some
pictures of himself[, o]ne of the pictures Mr. Griffith took
showed . . . [the individual] with an erection[,]" and he
admitted "he may have sent this photo to" another, named
individual.  (<u>Id.</u> at 33).  Inspector Svitek also recorded that
when Griffith was asked "what he thought should happen to child

6

pornographers," he responded "'[t]hey should be arrested, put in jail.'"  (**Id.**)

On December 17, 2002, the FBI ran a criminal history report on Griffith yielding four arrests, consisting of driving-related charges, public intoxication and a marijuana possession charge, all with no disposition listed.[3]

---

[3]The charges found are as follows:

Arrested on February 7, 2001, by the Kanawha County Sheriff's Department . . . on charges of "Driving Revoked (DUI)", with no disposition listed.

Arrested on December 16, 1999, by the . . . [West Virginia State Police] . . . on charges of "DUI", "Left of Center, Speeding, No Seatbelt" and "Possession of Controlled Substance Marijuana", with no disposition listed.

Arrested on December 21, 1985, by the Charleston Police Department . . . on charges of "DUI", with no disposition listed.

Arrested on March 28, 1981, by the Charleston Police Department . . . on charges of "Public Intoxication", with no disposition listed.

(**Id.** at 43).
During the portion of the evidentiary hearing held December 13, 2007, counsel for defendant Friend furnished a computer printout apparently run at the Kanawha County Courthouse indicating that Griffith "was arrested not four times, but five times, . . . [with] at least three convictions."  (Trans. of Hrg. at 1-2 (Dec. 13, 2007) ("12/13 Trans. at ---"))).  The three convictions related to (1) a guilty plea on a June 7, 1998, charge of possession/delivery of a controlled substance, (2) a no contest plea on a December 16, 1999, charge for the same offense, and (3) a no contest plea on a December 16, 1999, charge of driving under the influence.  Griffith was sentenced to six

(continued...)

7

A June 18, 2003, memorandum from S/A Dean Lauffer, who was assigned the case in March 2003, provides as follows:

> The basis for the search warrant was the interview of a victim who claimed Griffith took sexually explicit photographs of victim when [the] victim was a child.
>
> Griffith was interviewed by [S/A Franks and Inspector Svitek] . . . . Griffith stated that subsequent to the time of the victim's allegations, his computer was stolen and that the seized computer and the media seized with it are new. . . .
>
> Per FA Melinda C. Cash, a CART examination has not yet been performed.
>
> Griffith as well as [the assigned] AUSA . . . ha[ve] made a number of queries regarding the status of the [seized] computer.

(Offic. File of S/A at 168).  The Griffith matter was the first child pornography investigation assigned to Lauffer.  (Int. Summs., Ex. I at 1).

A July 31, 2003, memorandum from Lauffer additionally notes as follows:

> Subject, as well as [the assigned] AUSA . . . , have

---

[3](...continued)
months probation for the June 7, 1998, conviction and the same term, along with 24 hours in custody, for the December 16, 1999, convictions.  (12/13 Trans. at 8-10; 12/18 Trans. at 123-24).  Griffith additionally noted that he was required to appear in magistrate court as a result of a "small bag of marijuana" found during the December 11, 2002, search of his residence pursuant to the federal search warrant.  (12/18 Trans. at 86).  The marijuana does not appear in the search inventory and the charge was apparently dropped.  (Id. at 92).

made a number of inquiries as to the status of the
computer that had been seized from subject pursuant to
a search warrant.

On 07/17/2003, the writer left a message for
subject at telephone number . . . .

On 07/29/2003, the writer spoke with captioned
subject.  Subject was advised that analysis was being
conducted of his computer and upon completion and
review of the information he would be contacted.
Subject was advised that the person conducting the
analysis would be out of the office for a number of
weeks.

(Offic. File of S/A at 178).

At some point in 2003, the seized items were submitted

to a certified field examiner for the FBI Computer Analysis

Response Team ("CART") for analysis respecting whether there was

evidence of child pornography.  (Offic. File of FBI at 1, 4).  On

September 24, 2003, the examiner submitted a CART Report of

Findings ("CART Report") stating as follows:

An examination was conducted to search for the
types of files which may contain the data requested by
the Case Agent (C/A).  These types of files were found
and extracted and/or copied for review by the C/A.

(Id. at 4, 18).[4]  The court does not perceive this excerpt to

_____

[4]A March 26, 2003, memorandum from S/A Franks, which may be
dated incorrectly, provides that "A CART examination was
performed, and the results were forwarded to the writer.  It is
recommended that the results of the CART examination be reviewed
and that any exemplars of child pornography be printed and
presented to [the assigned] AUSA . . . . for a decision regarding
(continued...)

9

suggest that the digital forensic examiner found child
pornography within the seized materials but instead that the
"types of files" that might contain such visual depictions, such
as perhaps .jpg, .gif, and other types of graphic files, were
located during the search.  (Id.)  This conclusion is confirmed
by S/A Jack Remaley, who stated that the examiner "did not, nor
does she ever, evaluate or review any evidence . . . . [but
rather only makes] an image of the computer's hard drive to
determine if there [i]s information on it."  (Int. Summs., Ex. E
at 7; see also id., Ex. I at 1-2).

        Lauffer reviewed the evidence obtained from the CART
examination.  (Int. Summs., Ex. I at 1).  He stated his belief
that "99% of the images reviewed did not contain child
pornography."  (Id. at 2).  He further stated that during his
review "he saw approximately ten images which contained child
pornography, i.e., pre-pubescent photos of children."[5]  (Id.)

---

        [4](...continued)
prosecutive merit."  (Offic. File of Spec. Agent at 167).  In
assessing the accuracy of the date, the court notes the
aforementioned June 18, 2003, memorandum stating that the CART
examination had not yet been performed, along with the September
24, 2003, CART Report.  Additionally, the 2008 interview summary
of S/A Franks states his belief that the CART examination had not
occurred prior to the investigation being re-assigned to S/A
Lauffer.  (Int. Summs., Ex. C at 3).  Lauffer also states that he
was assigned the matter in March 2003 and that the "analysis of
what was on the computer was not complete at that time."  (Int.
Summs., Ex. I at 1).

        [5]Lauffer stated that "[b]y pre-pubescent he mean[t] no hair
on the genitalia."  (Id.)

10

In Fall 2003, Lauffer met with the assigned AUSA, who drafted a target letter that was delivered to Griffith by Lauffer on approximately October 28, 2003.  (See id.).  The target letter stated pertinently as follows:

> This is to advise you that a grand jury investigation has uncovered substantial evidence linking you to the commission of a federal crime . . . .  Accordingly, you have been identified as a target of a grand jury investigation. . . . [Y]ou may appear and testify before the grand jury in Charleston on November 4, 2003, at 9:30 a.m., if you desire.

(Offic. File of the U.S. Atty. at 4).

On or about October 31, 2003, Lauffer attended a meeting with Griffith and, apparently, the assigned AUSA at the United States Attorney's office.  (Int. Summs., Ex. I at 3; Ex. A att. at 2 ("Visitor Log")).  The Visitor Log reflects that Griffith stayed 70 minutes although it is unclear how much of that time was occupied by meeting with the assigned AUSA and Lauffer.  (Id.; Ex. A att. at 2).

Griffith was informed that there was child pornography on his computer.  (Id., Ex. I at 3).  Griffith stated his surprise at the revelation and that he did not know how it got there.  (Id.)  He stated he had no interest or involvement in child pornography but that others, whom he named, had access to

11

his computer.  (Id.)  Griffith offered to take a polygraph

examination.  (Id. at 4).

On February 19, 2004, Griffith voluntarily submitted to

a polygraph examination "in connection with downloading and

copying kiddie porn."  (Offic. File of S/A at 232, 234; Int.

Summs., Ex. I at 4).  Prior to the examination, but apparently on

February 19, 2004, the following synopsis was generated by

Lauffer:

> Subject's computer had been seized pursuant to a
> federal search warrant.  Upon analysis of the computer,
> a number of images portraying possible child
> pornography were identified.  Prior to the analysis,
> subject had made a number of requests for the return of
> his computer.  After the discovery of the images,
> subject was served a target letter.  Subject was
> surprised when advised of the findings.  Subject denies
> that he has any interest in child pornography, and if
> images were discovered he did not intentionally search
> for them or view the images that had been transferred
> from his computer to disks. . . .

(Offic. File of S/A at 224).

The Polygraph Report prepared by S/A Mark Divittis,

states as follows:

> Griffith advised that he never downloaded any
> child pornography.  He also advised that he never
> copied any child pornography onto "disks."  A review of
> the images on Griffith's computer hard drive determined
> that child pornography was downloaded and then copied
> from his computer onto disks.  Griffith denied any
> knowledge of child pornography on his computer and
> advised the he would never have copied any onto a disk

12

if it was inadvertently downloaded onto his computer
without his knowledge.  Griffith agreed to be
polygraphed to validate his statement.

**During the pre-test interview, Griffith advised that he
had viewed some of the pornographic movies he
downloaded from the KAZAA website which had boys as
young as 16 having sex with each other.  Griffith
advised he knowingly copied approximately ten such
movies onto disks for his "collection".**  Griffith
advised that he never downloaded any pornography with
pre-pubescent children, nor did he search for any child
pornography.  He would look at the title of the movie
then download it.  Griffith also advised that he did
not download or view any still pictures of child
pornography and would not have copied any if he had
seen that they had mistakenly been downloaded onto his
computer hard drive.

(Id. at 230-31 (emphasis supplied)).

        During the examination, S/A Divittis asked Griffith the

following questions, with S/A Divittis' opinion that follows:

### SERIES 1

A.    Did you ever search the [I]nternet for child
      pornography? Answer: NO

B.    Did you ever search the [I]nternet for child
      pornography through KAZAA?  Answer: NO

      It is the opinion of the examiner that the
      recorded responses to the above relevant questions in
      Series I were indicative of deception (DI).

(Id. at 231).  The examiner recalls advising Griffith that "he

had noted deception regarding some of the answers on the

polygraph." (Int. Summs., Ex. A at 1).  In response, Griffith

effectively denied knowingly downloading images of child

13

pornography, asserting that a 17 year-old male with whom he previously had a relationship was making allegations against him out of spite.  (Id.)

In his Interview Summary in January 2008, four years after the polygraph examination, S/A Divittis additionally observed that Griffith "never came close to making an admission and never retreated from his story that he did not intentionally download child pornography."  (Id.)  Quite to the contrary, on the "POLYGRAPH EXAMINATION WORKSHEET" that S/A DiVittis presumably executed in 2004, he apparently checked a box styled "Pre-Test Confession" and added the following inculpatory observation concerning the subject whom he was testing: "Griffith advised during pre-test interview that he copied pornographic movies involving boys between the ages of 16 - 18 after viewing movies on approximately ten occasions."  (Offic. File of S/A at 232).  That "confession" is in keeping with Griffith's statement at the pre-test interview to S/A Divittis that he had downloaded pornographic movies from the KAZAA website that had boys as young as 16 having sex with each other.

According to the assigned AUSA, "[t]here was nothing further done in the investigation of the case after the polygraph[,]" a representation corroborated by Lauffer (Int. Summs., Ex. B at 2, 3; id., Ex. I at 5).

14

On or about August 15, 2006, S/A Remaley assumed responsibility for the Griffith matter following the June 3, 2006, retirement of Lauffer.  (Int. Summs., Ex. E at 2). S/A Remaley did not discuss the case with Lauffer.  (Id.)  He reviewed the file generally when it was assigned, but did nothing with it until he conducted a further review prior to closing the investigation in May 2007.  (Id.) Remaley noted that at the time "there was a huge investigative load in the Charleston office." (Id.)  Between August 2006 and May 2007, he had no contact with either Griffith or the United States Attorney's office about the investigation.  (Id. at 3).

On August 16, 2006, the government filed a third superseding indictment in the Lecco and Friend action.  Count One alleged a drug conspiracy as to both Lecco and Friend, in violation of 21 U.S.C. § 846.  Counts Two through Four alleged Lecco's use of a firearm during and in relation to drug trafficking offenses, in violation of 18 U.S.C. § 924(c)(1)(A). Counts Five and Six alleged Lecco's possession of firearms after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1).  Counts Seven through Ten alleged drug distribution offenses against Lecco, in violation of 21 U.S.C. § 841(a)(1). Count Thirteen alleged that Lecco and Friend knowingly conspired to commit offenses against the United States, in violation of 18

U.S.C. § 1512(k).  The two remaining Counts alleged as follows:

   A.   Count Eleven -- That Lecco and Friend committed murder
        with a firearm, during and in relation to a cocaine
        conspiracy, causing the death of Carla Collins, in
        violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1); and

   B.   Count Twelve -- That Lecco and Friend killed Carla
        Collins for aiding a federal investigation, in
        violation of 18 U.S.C. §§ 1121(a)(2) and 2.

        The same day, the government filed notices of intent to
seek the death penalty relating to each defendant respecting
Counts Eleven and Twelve of the third superseding indictment.

        On February 27, 2007, the court directed the Clerk to
randomly select from the Charleston Qualified Jury Wheel the
names of 300 individuals qualified to serve as jurors.  United
States v. Lecco, No. 2:05-107, order at 1 (S.D. W. Va. Feb. 27,
2007).  Griffith was selected to appear for the jury selection
process that began on March 15, 2007.  He appeared as directed
and executed a detailed, 38-page written juror questionnaire
consisting of 127 questions. Id., dock. ent. 435-2 (S.D. W. Va.
Mar. 19, 2007).

        On April 16, 2007, Griffith appeared with a group of
other prospective jurors for individual voir dire.  Inasmuch as
the individual questioning of other prospective jurors that day
consumed more time than expected, the court requested those few

16

who remained that day, including Mr. Griffith, to return the next

day.  Mr. Griffith responded as follows:

> I have no problem with that, sir, but I do have a
> problem.  I work in Lewis County at Stonewall Jackson
> Memorial Hospital and I work 40 hours on the weekend
> full time, and I was under the assumption that I would
> be released from work if I was -- well, actually I
> thought when I came down here, [it] would be a civil
> case or something, not something for six weeks.

> . . . .

> And they told me that I would not be released from
> work.  So I would -- I don't -- I would have to be down
> here Monday through Friday, and then leave at 6:30
> Saturday morning to get there by 8:00 o'clock, and then
> I don't leave until midnight Sunday night, so I
> wouldn't get back into Charleston until 2:00 a.m.
> Monday morning.

(Unoffic. Trans. at 46).  Griffith agreed to return the next day

as requested.

On April 17, 2007, Griffith appeared again and was

questioned by the court and counsel for a 12-minute period.

(Id., dock. ent. 865 (S.D. W. Va. Apr. 17, 2008) ("Indiv. Voir

Dire. Trans. at ---")).  The court expressed concern about

Griffith's work schedule.  (Id. at 3).  The court asked Griffith

if he could arrange to return to Charleston at midnight or

earlier as opposed to 2:00 a.m.  (Id.).  The court advised

Griffith that he would "probably need that relief if . . . [he]

were to serve as a juror . . . . "  (Id. at 11).  It does not

17

appear Griffith made any further request to be excused based upon his work schedule.  His responses during the individual voir dire process were unremarkable.  For example, he expressed agreement with one lawyer's question concerning whether Griffith's death penalty views were "pretty middle of the road . . . ?"  (<u>Id.</u> at 7).

No party challenged Griffith for cause.  (<u>Id.</u> at 12).  While the assigned AUSA and at least one FBI agent involved in the investigation of Griffith reviewed the jury list for the <u>Lecco</u> and <u>Friend</u> trial as a matter of routine practice, they did not recognize Griffith's name.  (Int. Summs., Ex. B at 3-4; <u>id.</u> Ex. J at 2).  On April 30, 2007, Griffith was selected to serve on the jury.  <u>United States v. Lecco</u>, No. 2:05-107, dock. ent. 637 at 3 (S.D. W. Va. Feb. 27, 2007).  Trial of the guilt phase began on May 1, 2007.

During trial in the <u>Lecco</u> and <u>Friend</u> matters in early May 2007, S/A Remaley reviewed the child pornography investigation of Griffith at the request of the assigned AUSA due to the age of the file.  (Int. Summs., Ex. E at 3).  After reviewing "hundreds of images[,]", S/A Remaley could not find "any evidence of child pornography . . . ."[6]  (<u>Id.</u>)  He informed the assigned

---

[6]S/A Remaley made no mention of the statement of the individual who, as a 14 year-old, recounted seeing child
(continued...)

AUSA of his findings.  (<u>Id.</u>)  On May 10, 2007, another criminal history report was run on Griffith, yielding the same results as the report run on December 17, 2002.  (Offic. File of Spec. Agent at 228).  S/A Remaley ran the report consistent with his routine practice to assure the individual is not in other trouble or wanted on other charges.  (Int. Summs., Ex. E at 6).

On May 11, 2007, the jury convicted the defendants Lecco and Friend on all counts.  The assigned AUSA noted that he "signed a document closing his file [in the Griffith matter] on approximately May 18, 2007.  (Int. Summs., Ex. B at 2, 3).  He explained the declination as follows:

> [H]e was told by . . . Remaley that most of the images retrieved from Griffith's computer consisted of adult pornography and that any questioned images were "borderline."  [The assigned AUSA] . . . also was told that there were problems with the informer who may have had access to the computer, and that the images were collected through the use of a "creeper" search, which may have caused the questioned images to be inadvertently downloaded.

(<u>Id.</u> at 3; <u>see</u> Offic. File of the U.S. Atty. at 1, 3 (stating "Matter declined @ Agency Request . . . . [and for] [l]ack of

---

[6](...continued)
pornography on Griffith's computer, nor of S/A Lauffer's viewing of approximately ten images of child pornography involving prepubescent children, nor of Griffith's statement to S/A Divittis at the time of the failed polygraph examination, attended by Lauffer, that he had downloaded approximately ten movies of boys as young as 16 having sex with each other.

investigative resources . . . ." and "[m]uch of the porn found on computer was adult . . . . Leaves argument that child porn was inadvertently collected . . . . FBI (Jack Remaley) is in concurrence.").  The assigned AUSA further observed that he "does not inform individuals that they are no longer targets of an investigation" and that as "far as he is aware, Griffith was never advised that he would not be prosecuted."  (Int. Summs., Ex. B at 3).  He first learned of Griffith's jury service on the day that the misconduct was disclosed to the court, as more fully described within.  (Id. at 4).

Following the decision to decline the prosecution, S/A Remaley attempted to contact Griffith to return his computer, after erasing the hard drive consistent with FBI return policy. (Int. Summs., Ex. E at 3-4).  After three unsuccessful attempts to find Griffith at home, S/A Remaley left a note for Griffith at the residence on May 22, 2007, asking that he contact him.  (Id. at 4).  On May 23, 2007, Griffith phoned S/A Remaley at 7:45 a.m. (Id.)  S/A Remaley advised Griffith of the declination and the need for Griffith's permission to "wipe" the hard drive.  (Id.)

Griffith responded that he was on jury duty.  (Id.) S/A Remaley assumed it was state jury duty and offered to meet Griffith near the Kanawha County Circuit Court.  (Id.)  When

Griffith stated it "was federal[,]" S/A Remaley terminated the
conversation and arrived at the United States Attorney's office
approximately 30 minutes later to advise the <u>Lecco</u> and <u>Friend</u>
trial team of the contact.  (<u>Id.</u> at 5).

On the morning of May 23, 2007, 12 days after returning
its verdict finding the defendants guilty of Counts One through
Thirteen, and following closing arguments concerning the
appropriate sentence, but prior to the sentencing hearing jury
instructions by the court, the United States requested to be
heard <u>in</u> <u>camera</u>, but not <u>ex</u> <u>parte</u>.  A short time later, the
court, the parties, and counsel convened in order to permit the
government to make a disclosure to those assembled.  The gravity
of the matter warrants reproduction of the government's
disclosure, offered by its counsel at trial, in its entirety:

> Your Honor, I wish to report a matter involving
> one of the jurors, William Griffith, and the matter
> involves a communication between Mr. Griffith and
> Special Agent Jack Remaley of the FBI, who has just
> left the courtroom, and it also -- which leads to
> another issue about Mr. Griffith's questionnaire.
>
> Special Agent -- essentially, Your Honor, this
> office had an investigation open on Mr. Griffith at one
> point and the office declined it.  This morning Special
> Agent Jack Remaley, who was the agent, called Mr.
> Griffith to tell him the matter had been declined and
> that he had to return some property to Mr. Griffith and
> he asked if he could meet with him.  Mr. Griffith told
> Agent Remaley that he had jury duty.  Agent Remaley did
> not know that he was on this case.  Agent Remaley has

not worked on this case, but he said, "Oh, county duty? Why don't you just come over to the FBI office when you are finished in downtown Charleston."  And Mr. Griffith apparently told Jack Remaley that it was federal.  And at that point Special Agent Remaley thought, well, it might be this case, so he just said, "Well, I'll talk to you later" and he hung up.

        The investigation initiated I believe sometime in 2002.  There was a search warrant executed in December of 2002 at Mr. Griffith's home.  That search warrant is under seal.  The last contact between -- that I can see from any files that Agent Remaley brought over this morning occurred sometime in February of 2004 between the FBI and Mr. Griffith.

        And I bring this matter to the attention, one, to report that there was a contact between a government agent and a juror to tell that juror a criminal investigation had been closed on that particular juror and that contact was made this morning, and also to report that looking at his questionnaire, question 46 asks of all the jurors who filled out the questionnaire, have you, any members of your family, or close personal friends ever been -- and then please check all that apply.  The categories include the victim of a crime, a witness to a crime, accused of or charged with a crime, or investigated for a crime.

        Mr. Griffith's questionnaire indicates a check mark only in the victim of a crime, with nothing about being accused or charged of a crime or investigated for a crime.

        I would also inform the court that going through the FBI files, it appears that a criminal history check was done on Mr. Griffith indicating, it appears, four arrests going back to 1981 through 2001 on charges of public intoxication, DUI, left of center speeding, no seat belt, possession of controlled substance marijuana, and driving on revoked; with no disposition listed.

        So those are the facts that I wish to bring to the court's attention.

(Sealed Trans. at 4-7).

Upon further inquiry by the court, it was informed that the subject matter of the investigation of Griffith related to child pornography. At that juncture, the following exchange occurred between the court and the defense:

THE COURT: Let me hear from counsel.

MR. McNALLY: We have no motion.

THE COURT: Thank you.

MR. McCAMIC: I'm sorry, Your Honor. If we could have just a moment.

THE COURT: Yes.

(Pause [At which time counsel discussed the matter].)

MR. McCAMIC: Thank you, Your Honor. We also have no motion.

THE COURT: I take it then that the parties are satisfied to proceed with Mr. Griffith as a juror in this case.

MR. WRIGHT: Yes, Your Honor.

MR. McNALLY: Yes, Your Honor.

MR. McCAMIC: Yes, Your Honor.

(Id. at 6-7).

On May 29, 2007, the jury unanimously found that sentences of death were appropriate on Counts Eleven and Twelve as to both defendants Lecco and Friend. On June 8, 2007, S/A Remaley met with Griffith in the FBI parking area. (Int. Summs.,

23

Ex. E at 6).  Griffith executed a "CONSENT TO SEARCH
COMPUTER(S)[,]" countersigned by S/A Remaley, in which he
"grant[ed] [the FBI] permission to wipe the hard drive on . . .
[his seized computer] . . . currently in FBI custody."  (Offic.
File of Spec. Agent at 2).  A memorandum apparently drafted by
S/A Remaley the same day states "[p]rosecution of . . . [the]
matter was declined by the U.S. Attorney's office . . . .  The
computer, along with other items seized, will be returned."  (Id.
at 226).  S/A Remaley did not return the computer after learning
of the continuing inquiry by the court into the contact with
Griffith.  (Int. Summs., Ex. E at 6).

        In the second new trial motion, defendants contend,
inter alia, that a new trial is warranted given Griffith's
omission on his jury questionnaire that he was under
investigation for child pornography crimes and that he had been
previously arrested or charged with criminal offenses.
Defendants initially contended Griffith "gave false answers to at
least five questions on the jurors [sic] questionnaire."  (Sec.
New Tr. Mot. ¶ 6).  In their supporting memorandum filed March 4,
2008, defendants noted other untruthful, incomplete, or non-
compliant answers or omissions from Griffith.  The challenged
responses, essentially to questions 40, 41, 46, 50, 52, 124(a),
and 125, appear below:

40. Do you know, or have any connection with, any of the attorneys in this case or with any member of their offices?

**GOVERNMENT** (United States Attorneys for the Southern District of West Virginia):

| | | |
|---|---|---|
| Charles T. Miller, Esq. | Yes_____ | No_X__ |
| R. Gregory McVey, Esq. | Yes_____ | No_x__ |
| Philip H. Wright, Esq. | Yes_____ | No_x__ |
| Richard Burns, Esq. | Yes_____ | No_y__ |
| A member or members of their offices | Yes_____ | No_y__ |

**DEFENSE:**

| | | |
|---|---|---|
| Gary Collias, Esq. | Yes_____ | No_X__ |
| Jay T. McCamic, Esq. | Yes_____ | No_Y__ |
| Office of McCamic, Sacco, Pizzuti & McCoid | Yes_____ | No_x__ |
| Kevin McNally, Esq. | Yes_____ | No_x__ |
| Office of McNally & O'Donnell | Yes_____ | No_x__ |
| Mary Lou Newberger, Esq. | Yes_____ | No_x__ |
| Office of the Federal Public Defender | Yes_____ | No_x__ |
| A member or members of their offices | Yes_____ | No_y__ |

41. Do you know anyone else at the Office of the United States Attorney for the Southern District of West Virginia, or have you had any dealings with that office?

Yes_____ No_X__

IF YES: please explain: _____

_____

46. Have you, any members of your family or close personal friends ever been: (please check all that apply):

✓ the victim of a crime (whether or not it was reported to the police)
_____ a witness to a crime
_____ accused of or charged with a crime
_____ investigated for a crime

IF YES: please describe the situation. _Breaking /Entering_.

50. Have you ever been questioned in any matter by any federal, state or local law enforcement agency or agent (including the Department of Justice, Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), Alcohol, Tobacco & Firearms (ATF), Internal Revenue Service (IRS), Immigration & Naturalization Service (INS), Customs Service, or Department of Homeland Security, West Virginia State Police, Mingo County Sheriff's Department, Matewan Police Department, Williamson Police Department, Huntington Federal Drug Task Force)? Yes_____ No_x__

IF YES: please explain: _____

_____

_____

_____

52. Have you, or do you expect to, become involved in any legal action or dispute with the United States, or any officers, agents, or employees of the United States?

Yes_____ No _X_

IF YES: please explain: _____

_____

_____

_____

124a. Is there any additional information not asked about in this questionnaire which you feel that the judge and/or the attorneys should know about you before considering you for the jury in this case?                                                      Yes_____ No _X_

IF YES: please explain: _____

_____

_____

125. Is there anything you would like to discuss privately that would have bearing on your being a juror?                                                      Yes_____ No _X_

(Question. of Jur. William Griffith ¶¶ 40-41, 46, 50, 52, 124(a), and 125) ("Jur. Ques. at ---").[7]  Griffith answered under penalty of perjury.  (Id. at 38).

On December 3, 2007, the court scheduled a sealed evidentiary hearing for December 13, 2007, at which Griffith would be examined under oath by counsel in order to aid the disposition of defendants' motions.  United States v. Lecco, No. 2:05-107, slip op. at 40 (S.D. W. Va. Dec. 3, 2007).  The jury

_____

[7]Questions 64 through 66 and 69 also appear to contain false responses.

administrator was directed to summon Griffith in writing to
appear at that time and, if he inquired further, to advise him
only that the court needed to make further inquiry of him
relating to his prior jury service.  Id.  The jury administrator,
the parties, and counsel were directed to have no contact with
Griffith prior to the evidentiary hearing.  Id.

On December 13, 2007, counsel and the parties appeared
for the evidentiary hearing.  (12/13 Trans. at 1-2).  After
Griffith took the stand, the court observed that some of the
answers provided on his juror questionnaire may not have been
accurate.  (Id. at 14).  Inasmuch as the juror questionnaire was
signed under oath, Griffith was further advised that his
responses might conceivably incriminate him.  (Id.)  After
advising Griffith of his Fifth Amendment rights, and assuring
that they were understood, Griffith responded "I think I need to
talk to a lawyer. . . . there were some things because of my job
I could not discuss with you all, and I'm sorry."  (Id. at 15).

Griffith chose to retain counsel rather than seeking an
appointed lawyer.  In order to allow Griffith time to retain
counsel, the evidentiary hearing was adjourned until December 17,
2008.  On December 17, 2008, Griffith appeared with counsel,
Clinton W. Smith. (Trans. of Hrg. at 29-30 (Dec. 17, 2007)

27

("12/17 Trans. at ---"))).  The court inquired of Griffith concerning his response to question 41 of the written juror questionnaire, at which point Mr. Smith advised that his client would exercise his Fifth Amendment privilege as to all inquiries made of him respecting the questionnaire.  (Id. at 30-31).  After Griffith was excused temporarily, the court granted the government's motion for an order compelling his testimony pursuant to 18 U.S.C. 6003.  (Id. at 47).  The court  then adjourned the hearing to December 18, 2007, to facilitate public notice of the proceedings.  (Id. at 55).

On December 18, 2007, the evidentiary hearing re-convened.  (Trans. of Hrg. (Dec. 18, 2007) ("12/18 Trans. at")).  Salient testimony adduced at that hearing includes the following:

- Griffith understood it was important to provide accurate and complete information that was responsive to the questions asked of him during the voir dire process. (Id. at 77);

- He did not expect to be called back after executing the questionnaire because, as he stated, he "knew . . . [he] wasn't very truthful in some matters that concerned" him.  (Id. at 81).  Indeed, he thought the United States knew about the pending investigation of him and that it would realize the omissions on his questionnaire.  (Id. at 81-83);

- He "didn't want to be on this jury."  (Id. at 82);

- He knew when executing the written juror questionnaire that his response to question 46 was incomplete because (1) he omitted the fact that he had been previously

28

charged with DUI and controlled substance offenses and arrested for the DUI offenses, and (2) he was accused by agents of the United States as having committed a child pornography offense. (Id. at 98-99);

- He asserted he was found by law enforcement to have been in possession of marijuana on three separate occasions and that he previously pled guilty to a charge of marijuana possession in 1999 and was sentenced to six months probation. (Id. at 120-21, 124);

- He knew that he was involved in a "dispute with the United States" as contemplated by question 52, but did not respond appropriately by answering "Yes" to that question. (Id. at 100);

- He conceded the "truthful answer" to question 50, regarding whether he had been previously questioned by a federal law enforcement agency such as the FBI, was "Yes" but he responded "No[.]" (Id. at 100);

- He conceded as follows: "I wasn't trying to hide -- I mean, I guess I was trying to hide something, but not from one person from the other . . . ." (Id. at 101);

- When asked if he was "concerned every day . . . [when he came to court] that somebody might say something about the [child pornography] investigation," he responded "I guess it was in the back of my mind . . . ." (Id. at 116 (emphasis supplied); and

- With respect to questions 41, 46, 50, 52, 64, 66, 69, 124(a), and 127, Griffith conceded, either explicitly or implicitly, that he gave inaccurate or false information. (Id. at 154-60).

Aside from the foregoing responses, Griffith offered other responses, some of which are reproduced below, that are indicative of one who did not desire to be entirely forthcoming:

- He did not think there was an ongoing investigation of him by the United States at the time of the voir dire

process, although (1) his computer was in the United
States' custody, (2) he had received the October 28,
2003, target letter, (3) he was advised child
pornography was found on the materials seized from his
home, and (4) he was advised that deception was
observed when he responded to material questions during
a polygraph examination.  (Id. at 83 ("I didn't think
there was an ongoing investigation.")).  Griffith later
agreed with the statement of counsel that he "was never
specifically advised that the investigation was over"
and that he "just hoped it was over due to the passage
of time . . . ."  (Id. at 132).  Late in the day during
the December 18, 2007, hearing, Griffith observed for
the first time that he "thought there was a statute of
limitations or something."  (12/18 Trans. at 174);

- He stated that after meeting with the assigned AUSA and
  Lauffer after receipt of the October 28, 2003, target
  letter, that he "met with . . . [two] agents, a couple
  of months or maybe a month later, and then that was the
  end of it."  (12/18 Trans. at 96; see also id. at 125
  (stating "I met with two agents and talked to them . .
  . ." ).  The meeting with the agents, as opaquely
  described, was in fact the occasion when Griffith met
  S/A Lauffer and S/A Divittis at a local hotel where he
  took, and failed, the polygraph examination
  administered by S/A Divittis on February 19, 2004.
  (See, e.g., Int. Summs., Ex. I at 4-5);

- Griffith additionally stated that sometime during that
  meeting (on the occasion of the polygraph examination)
  "that one agent told . . . [him] that there was nothing
  on . . . [the] computer."  (12/18 Trans. at 112).  As
  noted, Lauffer told Griffith on October 31, 2003, that
  child pornography had been found on his computer.
  (Int. Summs., Ex. I at 3).  On February 19, 2004, S/A
  DiVittis additionally advised Griffith that deception
  was noted during the polygraph examination and that
  Griffith responded to the effect "that he did not
  knowingly download images of child pornography." (Int.
  Summs., Ex. A at 1; Offic. File of S/A at 230);

- Griffith stated that after he met with Lauffer and the
  assigned AUSA on October 31, 2003, he "thought . . .
  [the investigation] was through."  (12/18 Trans. at
  115).  In actuality, Griffith was advised at the
  October 31, 2003, meeting that child pornography was

found on his computer and that a polygraph examination would be scheduled, which, as noted, he failed on February 19, 2004.  (Int. Summs., Ex. I at 3-4);

- He was evasive respecting whether he had been "accused" of a crime in connection with the child pornography investigation, but eventually conceded he thought he had been so accused after receipt of the October 28, 2003, target letter. (12/18 Trans. at 99);

- When asked about his life experiences with possession or use of illegal controlled substances, Griffith explained that he did not know the question "was relevant" to the <u>Lecco</u> and <u>Friend</u> case.  (<u>Id.</u> at 122). The juror questionnaire contained at least nine questions relating to controlled substance issues. (Jur. Ques. at 18-20).  The juror questionnaire explained that the defendants were charged with drug trafficking. (Jur. Ques. at 2).  During individual voir dire, Griffith was questioned specifically concerning the fact that "drug use and drug dealing" might be in issue in the case.  (Trans. of Indiv. Voir Dire at 10 (S.D. W. Va. Apr. 17, 2007));

- Griffith testified twice, without further elaboration, that around 1979, while "[i]n college . . . [he] used cocaine."  (12/18 Trans. at 157, 176).  When questioned in December 2002 by Postal Inspector Svitek and S/A Franks, Griffith advised that he had "not used cocaine for 'a couple of years.'"  (Offic. File of the FBI at 25);

- Griffith contended that he "was very fair and impartial" during his jury service.  (12/18 Trans at 162).  When asked, however, if he "were on trial for" his "life, would . . .[he] want a juror who was being investigated by the same prosecuting office to be on the jury[,]" he responded "<u>Probably not</u>."  (<u>Id.</u> (emphasis supplied);

- Despite (1) the December 11, 2002, search and seizure at his home, after which he consulted with his attorney Mr. Smith in late 2002 or early 2003, (2) the language of the target letter of October 28, 2003, and (3) his visit on or about October 31, 2003, to the United States Attorney's office, Griffith did not believe that he was "in trouble" in October 2003  (<u>Id.</u> at 164-65, 168); and

- Despite the language found in questions 124(a) and 125, and the May 23, 2007, contact with S/A Remaley, Griffith professed that it did not occur to him to notify the court about the falsehoods in the questionnaire.  (Id. at 172).

During the December 18, 2007, evidentiary hearing, the court entered the United States' proposed order turning over to the defense the investigative files relating to Griffith in the possession of the United States Attorney and the Federal Bureau of Investigation.  United States v. Lecco, No. 2:05-107, order at 1 (S.D. W. Va. Dec. 18, 2007).  As noted, the December 18, 2008, order was subject to a protective device that, inter alia, required redaction of the names and other identifying information of persons, other than law enforcement, other governmental officials or employees, and Griffith.[8] Id.  In order to provide

_____

[8]The direction additionally provided as follows:

To protect the privacy interests of William Griffith, consistent with 5 U.S.C. § 552a(b), and that of any juvenile, consistent with 18 U.S.C. § 3509 and 18 U.S.C. § 5038, counsel for defendants shall use the materials disclosed only as necessary to resolve the issues raised in their Second Joint Motion for New Trial, shall refrain from mentioning or otherwise identifying any juveniles, shall not disclose any materials to anyone whose knowledge of the same is not necessary to the defense in this case, and shall return the materials to the United States upon resolution of the Second New Trial Motion.

United States v. Lecco, 2:05-107, slip. op. at 2 (S.D. W. Va. Dec. 18, 2007).

counsel adequate time to review the investigative files, the evidentiary hearing was continued first to January 24, 2008, and then, by joint motion, to February 4, 2008.  United States v. Lecco, No. 2:05-107, order at 1 (S.D. W. Va. Dec. 20, 2007); id., order at 1 (Jan. 22, 2008); Jt. Mot. at 1 (Jan. 16, 2008)).  The same order prohibited defense counsel from disclosing the contents of the files to any other person until the further order of the court.  (Id. at 1-2).

Preceding the February 4, 2008, hearing, defense counsel apparently learned after reviewing the investigative files that Griffith did not disclose the nature of the "meeting" he had with Lauffer and S/A Divittis in February 2004 that occurred after he met with Lauffer and the assigned AUSA in October 2003.  Griffith was confronted with the omission when counsel for defendant Friend inquired "You failed . . . [the February 2004] polygraph, didn't you?"  (2/4 Trans. at 210).  Griffith responded "Yes."  (Id.)

II.


A.   Waiver and Forfeiture[9]


In response to the second new trial motion, the
government asserts as follows:

> Defendants waived any objection to juror Griffith's
> continued service. Neither counsel asked for additional
> information, nor did counsel request an opportunity to
> question juror Griffith concerning the investigation,
> his knowledge of it, or its effect on his ability to be
> a fair and impartial juror.  Rather, counsel made a
> tactical decision not to object to juror Griffith's
> continued service at trial.

(Gov't.'s Sealed Resp. at 4).  In support, the government contends

Gray v. Hutto, 648 F.2d 210 (4th Cir. 1981), and United States v.

Breit, 712 F.2d 81 (4th Cir. 1983), control.


In Gray, a decision spanning seven paragraphs, the

court of appeals confronted a state habeas petitioner's

contention that his rights were violated by a juror's disclosure

to her husband during a trial recess that she thought the

petitioner was guilty of a controlled substance offense for which

he was then on trial.  Although the juror communication was known

_____

[9]Waiver and forfeiture are two deeply rooted doctrines
designed, in part, to advance certainty and finality in the
judicial process.

to Gray's counsel while the trial was in progress, the matter was first brought to the attention of the state court in a post-trial motion.  Following exhaustion of his state remedies, the district court denied petitioner's section 2254 motion, stating "'the court accepts the state court's finding, and the evidence which amply supports that finding, that . . . [the juror] did not decide the issue of guilt or innocence until after the jury began its deliberations.'"  Gray, 648 F.2d at 210.

The court of appeals noted the gravity of the petitioner's argument:

> Gray . . . might have raised a very serious question. "Private communications, possibly prejudicial, between jurors and third persons, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  Mattox v. United States, 146 U.S. 140, 150, 13 S. Ct. 50, 53, 36 L. Ed. 917 (1892).

Id. at 211.  Unlike the district court, however, the court of appeals did not reach the merits of the petitioner's argument.

After observing that Gray's counsel had been told about the juror communication during the course of the trial, and that the matter was first brought to the court's attention post-trial by a lawyer appointed to handle the appeal, it was noted that "a period of 47 days was permitted to elapse during which the opportunities greatly increased for memories, both of the juror

35

and of the witnesses who claimed to have overheard her, to grow
vague or to reform and vary the recollections."  Id. at 211-12.
After concluding these facts "essentially amount[ed] to a
waiver[,]" it was observed as follows:

> In short, however strong Gray's case for a
> mistrial might have been had the court been immediately
> notified, counsel's deliberate inaction amounted to a
> conscious decision to find out what the jury was going
> to do.  Obviously counsel preferred to proceed in hopes
> that the jury might acquit.  Counsel's approach, were
> we to grant the requested habeas corpus and
> accompanying new trial, would allow the defendant two
> bites at the apple, with a most unfair reduction,
> because of the passage of time (more than two years),
> in the probability that the Commonwealth could present
> its case as strongly as would have been possible had a
> mistrial, and consequent new trial, been sought and
> granted immediately.
>
> Thus, we substantively refrain from deciding
> whether it would have been appropriate, once the
> assumption was made that the juror had committed the
> claimed impropriety, to attempt to correct or
> neutralize the questionable conduct by a cautionary
> instruction.  Even if it was not, the allowing of time
> to pass, with the consequent adverse changes in the
> position of the Commonwealth and the inevitable
> prejudicial increase in expenditure of time and effort,
> have cost Gray the force of the argument.

Id. at 212.

     In Breit, the defendant was a member of the bar accused
of multiple controlled substance offenses.  Prior to trial,
Breit's son William, also a lawyer, conducted an extensive
investigation into the 55 to 60 prospective jurors drawn for the

36

case.  During voir dire, the court inquired whether any venire member or any member of his or her immediate family served as a witness or an accused in a criminal case.  Two jurors who ultimately were selected to serve on the case failed to disclose their respective sons' criminal records ("the first juror" and "the second juror" respectively herein).  The first juror additionally concealed she had previously been a criminal defendant.

Five days after his conviction, Breit informed the court of the jurors' misconduct and moved for a new trial.  He claimed he first learned about the second juror's misconduct by an anonymous telephone call post-trial.  He added that the call then provoked a further investigation of the panel by the defense team, resulting in the discovery of false responses by the first juror.

The district court convened an evidentiary hearing, the fruits of which were recounted by the court of appeals.  It was uncovered during the hearing that one of the defendant's other sons, Jeffrey, also a lawyer, was told prior to trial by an investigator and close friend, Shuttleworth, that the first juror "wouldn't be a bad juror."  Id. at 81.  Jeffrey admitted he thought the investigator was implicitly indicating that the first

juror or a family member had previously been in criminal trouble. Jeffrey testified he told William only that he thought the first juror would not be a bad juror.

Respecting the second juror, Jeffrey conceded another investigator, Collins, disclosed to him after the jury was sworn, but prior to return of verdict, that one of that juror's children had "had some trouble."  Id. at 82.

Shuttleworth testified he told Jeffrey prior to trial that he had represented the first juror and that he thought she would make "a very good juror."  Id.  Collins testified that during a recess he told Breit's lead counsel that the second juror's "son[] had been in trouble" and also advised Jeffrey of the son's very serious criminal history.  Id.

Breit denied that Jeffrey disclosed the information to him, but admitted prior to the verdict that he knew the first juror had previously been charged with homicide.  He also advised that Jeffrey told him Shuttleworth had probably represented that same juror and thought that she would be favorable to the defense.

After noting Gray, the court of appeals prescribed the appropriate standard of proof for waiver of juror misconduct, along with the question of whether waiver occurred:

A defendant who remains silent about known juror
misconduct -- who, in effect, takes out an insurance
policy against an unfavorable verdict -- is toying with
the court.  To hold the government to an exacting
burden of proof of the defendant's knowledge -- a
matter by definition best known to the defendant and
his acquaintances rather than the government -- is
effectively to invite that policy to be cashed in at
high value and little risk to the defendant, but at
great cost to the finality of verdicts and the
integrity of the trial process.  We conclude that the
proper standard to resolve whether Breit knew before
the verdict of the jurors' alleged misconduct is proof
by a preponderance of the evidence. In this particular
case, we further find that the evidence establishes
beyond a reasonable doubt that Breit knew before the
verdict the critical information about . . . [juror
misconduct]."

    . . . .

We conclude that by not bringing the jurors' misconduct
to the attention of the trial court, Breit waived his
right to a new trial.

Id. at 83.

The United States contends the case for waiver here is
stronger than in both Gray and Breit inasmuch as both defendants
and their respective counsel knew, prior to the sentencing phase
of their case being submitted to the jury, about Griffith's
inaccurate responses on his questionnaire as well as the United
States' investigation of him and chose not to object to his
continued service at trial, or so much as request that the court
inquire of him, with or without counsels' participation.  The
government contends defendants believed that Griffith's

39

background would pre-dispose him in their favor and knowingly and voluntarily chose not to pursue the matter.

The key differences between this case and that of Gray and Breit, however, are monumental.  In each Gray and Breit the jurors' misconduct was known by defense counsel, but not the state, during the course of the trial; yet, in each case it was not disclosed by the defense until the defendant was convicted and a new trial sought on that very ground.  Quite the opposite occurred here, where defense counsel knew nothing of the juror's misconduct or the United States' grip upon him until after the defendants were convicted on all counts.  Rather, it was the United States, though not the prosecution team, that knew of the child pornography charge and Griffith's criminal record, admittedly without appreciating its significance prior to Griffith mentioning his jury service to Remaley.

The defense decision to make no motion during the sentencing hearing, upon first being advised of the juror's falsification as the two-week sentencing hearing reached the instructional stage, waived nothing and forfeited nothing for a variety of reasons.  Foremost, the defendants had already been found guilty on all counts -- only the sentencing by the jury on the two death penalty counts remained.  Defendants were not

40

required for any reason to make <u>any</u> motion regarding the guilty verdicts at the time of the prosecution team's revelation with respect to Griffith.

Furthermore, the defendants, aware only of the limited disclosure consisting of what the prosecution team then knew about Griffith, were under no obligation to accept, either as accurate or complete, that of which they had just been informed. Indeed, they lacked the necessary facts upon which to base or make an intelligent waiver or to be charged with a forfeiture with respect to the sentencing hearing.  As will be further noted, the defendants also lacked an efficient and expeditious means for developing those facts without unduly impeding the progress of the hearing.

Respecting the factual vacuum, <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938), and its progeny teach that waiver is the "intentional relinquishment or abandonment of a known right." <u>Id.</u> at 464; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993) (quoting <u>Johnson</u>).  The United States' May 23, 2007, disclosure, made promptly and likely without the benefit of a careful and searching review, was skeletal.[10]  The disclosure did

_____

[10]The court does not suggest the United States Attorney's Office or members of the Federal Bureau of Investigation acted
(continued...)

41

not include, <u>inter alia</u>, the following significant facts relating

in part to the substantial strength of the United States'

potential charges against Griffith: (1) the scope of and fruits

of the search of Griffith's home and that a search of his

computer yielded images of child pornography, (2) the contents of

the pre-search interview by S/A Franks and Inspector Svitek of

the 18 year-old individual, who was complaining of events

occurring when, at 14 years of age, he was staying for periods of

two weeks or more at Griffith's home, including viewing

electronic images of child pornography, (3)  issuance of the

October 28, 2003, target letter informing Griffith that a grand

jury had uncovered substantial evidence linking him to the

commission of a federal crime, (4) Griffith's admission to S/A

---

[10](...continued)
inappropriately.  Defendants emphasize at least three
considerations to the contrary.  First, they note that law
enforcement agents and the assigned AUSA were fully aware of the
pending charges against Griffith.  Second, they point out a
member of the United States' trial team initialed a document
authorizing the Griffith investigation in December 2002 and
thereafter conducted periodic file reviews generally with the
assigned AUSA.  Third, they assert that a supervising FBI agent
was also present during the search of Griffith's residence and
participated in some facets of the Lecco/Friend investigation.
None of these or similar allegations suffice to demonstrate any
impropriety.  Beyond an automatic attribution theory offered by
defendants pursuant to <u>Santobello v. New York</u>, 404 U.S. 257, 262
(1971), and similar authorities, which the court need not reach,
there is no basis in the record to conclude that personnel in
either the United States Attorney's office or the federal law
enforcement officers involved in Griffith's case acted in an
unethical or illegal manner.

Divittis of having downloaded, and copied, pornographic movies of boys as young as 16 years of age having sex with each other, a disclosure S/A Divittis apparently characterized as a "Pre-Test Confession[,]" and (5) the failed polygraph examination. Moreover, the evidentiary hearings revealed for the first time that Griffith had not simply four arrests for generally minor charges with no disposition shown, but also three convictions and sentences, two of which were for controlled substance offenses.

The question then arises whether defendants were constrained to lodge an objection to Griffith's continued service and move for a mishearing on the sentencing phase of the two murder counts before having all the available facts; or, alternatively, to demand a fuller inquiry, before reaching a decision on whether to seek a mishearing, while the sentencing proceeding comes to an abrupt and extended halt.

Regarding the first option, it is quite likely the court, in this most unusual of settings, would have either denied the motion for mishearing without prejudice or deferred action on it pending the sentence verdict by the same 12 jurors, just as the court did here without a motion; after which all the pertinent facts pertaining to Griffith could be ascertained, marshaled, and ruled upon.  Bearing upon the court's decision to

proceed with the sentencing hearing, with or without a motion for mishearing, is the eminently practical one of avoiding, insofar as it may prove possible, sacrificing six weeks of trial and thousands of hours of trial preparation and costly expert resources expended by defense counsel alone.  Exacerbating the concerns of the court and the parties is that there were no alternate jurors.  The alternates were necessarily excused when the jury commenced its deliberations on the guilt phase of the case.  Any delay would enhance the prospect that a juror may fall ill or otherwise become incapable of continuing service in the sentencing phase of the case, a circumstance that would likely have aborted the sentencing hearing and required that those proceedings start anew.[11]

Proceeding with the sentencing hearing, with or without a motion for mishearing, was vastly superior to the competing option available to defendants, namely, demanding a fuller

---

[11]The Federal Death Penalty Act, 18 U.S.C. §§ 3591 et seq., contemplates use of the Federal Rules of Criminal Procedure respecting the selection and use of jurors.  Rule 23(b) provides that, prior to verdict, the parties may stipulate, with court approval, to a jury of fewer than 12.  Prior to the commencement of deliberations, the court could not proceed with 11 jurors absent defendants' consent.  Absent a stipulation, the court would thus have been required to declare a mishearing and empanel a new sentencing jury pursuant to section 3593(b)(2)(C).  A complicating factor is that the sentencing jury is to consider not only the evidence offered at the sentencing hearing but also the evidence adduced at the trial.

inquiry and commencing days or weeks of collateral investigation and litigation concerning Griffith's fitness to serve, with the sentencing jury waiting in the wings.  A fuller examination of that competing option illustrates why it was impractical.  An adequate inquiry of Griffith and the surrounding circumstances has thus far spawned his retention of counsel, complex privacy issues, substantial briefing, and an evidentiary record consisting of, inter alia, three hearings and hundreds of pages. It is difficult to imagine a jury poised to begin penalty deliberations waiting for days or weeks on end while the necessary evidentiary record was developed.

Were it possible though to have expeditiously and efficiently developed the record, the revelation that Griffith was essentially at the sovereign's mercy and had engaged in a lengthy string of material falsehoods on voir dire would have resulted in one of two outcomes.  First, the parties might have stipulated, as noted, to a sentencing verdict by less than 12 jurors.  In this highest-of-stakes case it seems all but inconceivable that the defendants would have done so -- especially when they stood blameless for the situation thrust upon them. (See, e.g., United States v. Lecco, 2:07-107, dock. ent. 899-2, at 5 (S.D. W. Va. Sept. 7, 2007) (Def.'s Jt. Reply

stating "The choice to proceed with eleven jurors is no choice at all, given the right to a jury of twelve.")).  The second outcome would have been to dismiss Griffith and, absent consent to proceed with 11 jurors, declare a sentencing mishearing.

Viewed in this posture, defendants' decision to proceed without inquiry as to Griffith or the surrounding circumstances does not seem to be a case of attempting to game the system.[12] The court concludes that it was not incumbent upon the defendants either to move for a sentencing mishearing without knowledge of all available facts or to seek an extended delay of the sentencing hearing while the pertinent facts were gathered before deciding whether to move for a sentencing mishearing.  With the benefit of hindsight, all roads would lead to the same destination -- consideration of a new trial -- regardless of whether the inquiry was made of Griffith during the sentencing hearing or after the sentencing verdict.

Based upon the foregoing, a finding of waiver is insupportable.  Absent the critical facts developed posttrial,

[12]The United States suggests that the defendants strategically took a wait-and-see approach hoping for the chance to spend the rest of their natural lives in prison.  Perhaps so, perhaps not.  In any event, had the United States been able to maintain procedures that would have called to light, at the jury selection stage, the Government-known circumstances surrounding Griffith, it is safe to suppose that he would then have been excused from jury service by acclamation.

defendants cannot be deemed to have been armed with the necessary facts upon which to base an intentional relinquishment of so substantial a right, namely, <u>to challenge a death juror's impartiality</u>.[13]

The court has also considered the impact of the recent decision in <u>Puckett v. United States</u>, 129 S. Ct. 1423 (2009), which involved forfeited error under Federal Rule of Criminal Procedure 51(b). The defendant in <u>Puckett</u> complained for the first time on appeal that the United States, in direct contravention of its express agreement with the defendant in the plea agreement, opposed any offense level reduction for acceptance of responsibility. Defendant did not receive the reduction and asserted error for the first time on appeal.

The majority opinion noted the same principle espoused in <u>Gray</u> and <u>Breit</u>, namely, that "the contemporaneous-objection rule prevents a litigant from '"sandbagging"' the court -- remaining silent about his objection and belatedly raising the

---

[13]It is noteworthy as well to consider the court's actual inquiry of counsel. The court asked "I take it then that the parties are satisfied <u>to proceed</u> with Mr. Griffith as a juror in this case." (emphasis supplied). The affirmative responses to that query by counsel for the United States and the defendants alike say nothing about their positions respecting the effect of Griffith's service to that point, namely, his participation in the verdict of guilt.

error only if the case does not conclude in his favor."  Id.,
slip op. at 5; see also id. at 10 ("requiring the objection means
the defendant cannot 'game' the system, 'wait[ing] to see if the
sentence later str[ikes] him as satisfactory,' and then seeking a
second bite at the apple by raising the claim.") (citation
omitted).

        The circumstances in Puckett and this action differ
markedly.  First, Puckett is focused upon the withdrawal of an
appellate remedy for a defendant who stood silent in the district
court in the face of an obvious error.  In this action,
defendants moved timely for a new trial pursuant to Rule 33,
having been unaware of the Griffith problem until well after the
guilty verdicts were received.  Even then, defendants lacked the
necessary facts, or an efficient and expeditious means for
developing them, during the sentencing hearing.  Puckett
repeatedly condemns as forfeiture only the failure to timely
raise an objection to error.  See, e.g., id. at 4 ("If a litigant
believes that an error has occurred (to his detriment) during a
federal judicial proceeding, he must object in order to preserve
the issue.  If he fails to do so in a timely manner, his claim
for relief from the error is forfeited.").  In view of the
limited and late nature of the United States' disclosure, it is
difficult to conclude defendants acted dilatorily with respect to
the sentencing hearing.

Second, even assuming one could properly conclude forfeiture applies as to the sentencing hearing portion of the case inasmuch as defendants had some reason to question Griffith's fitness prior to the death verdicts, there is no reasoned basis to so conclude as to the guilt verdict rendered well before the United States' disclosure.  Defendants had no opportunity to object to Griffith's continued service prior to their guilt being determined by him and his fellow jurors. Defense counsel cannot be expected to have perceived an obligation to move for a new trial as to the guilt determination when Rule 33 afforded them a greater time frame for doing so and the promise of a fully developed evidentiary record.  In sum, there has been no showing of an affirmative waiver or a forfeited claim respecting Griffith.

The court has also considered the potential applicability of Federal Rule of Criminal Procedure 52(b), which provides that, "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."  Fed. R. Crim. P. 52(b).

The Rule is thought by many to have application only in an appellate setting.  The decisions are not unanimous on that point.  See, e.g., United States v. Carpenter, 494 F.3d 13, 30,

32 (1st Cir. 2007) (Campbell, J., dissenting)("Without having been contemporaneously alerted by a Rule 51(b) objection, the district court was obliged, when it ruled on defendant's post-verdict motion for a new trial, to employ plain error review under Rule 52(b)."); United States v. Heron, 525 F. Supp.2d 729, 751 n.48 (E.D. Pa. 2007) ("Although plain error analysis is usually the province of the Court of Appeals, the Rule -- which is contained in the Federal Rules of Criminal Procedure, not the Federal Rules of Appellate Procedure -- is not limited to appellate practice."), rev'd on other grounds, Nos. 08-1061, 08-1622 (3rd Cir. Apr. 2, 2009); United States v. Washington, 263 F. Supp.2d 413, 426 n.7 (D. Conn. 2003).

As Olano makes clear, the errors to which Rule 52(b) refers are not limited to those committed by the district court: "If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection." Olano, 507 U.S. at 733-34. Of particular note here on the question of error is United States v. Lawhorne, 29 F. Supp.2d 292, 313 (E.D. Va. 1998):

> [W]hether categorized as improper juror contact or juror bias, Lawhorne's trial was infected by deviation

> from a legal rule, namely the Sixth Amendment right to
> trial by an impartial jury.  Communications with, and
> bias in favor of, the prosecutor in a criminal case are
> evidence tending to show that the Juror likely reached
> a verdict on grounds other than the trial evidence.
> This is an error of the most fundamental sort and there
> can be no serious doubt that it falls within the reach
> of the term "error" under Rule 52(b).

Id. at 314.  Assuming an error of a Sixth Amendment magnitude is

deemed to have occurred at the sentencing hearing, with its roots

having taken hold during voir dire in this capital case, the

court would conclude that the remaining requirements of Rule

52(b) are satisfied such that any perceived forfeiture should now

be remedied.  See, e.g., Puckett, 129 S. Ct. at 1429 (noting "[1]

there must be . . . a '[d]eviation from a legal rule' . . . that

has not been . . . affirmatively waived, . . . [2] the . . .

error must be clear or obvious, rather than subject to reasonable

dispute[,] . . . [3] the error must have affected . . .

substantial rights, which in the ordinary case means . . . it

'affected the outcome of the district court proceedings[]' [and]

. . . '"'[the error] seriously affect[s] the fairness, integrity

or public reputation of judicial proceedings.'"')(citations

omitted); United States v. Basham, 561 F.3d 302, 329 (4th Cir.

2009) (same).

Based upon the foregoing, the court concludes

defendants neither waived, forfeited, nor otherwise defaulted in

seeking to challenge Griffith's impartiality post trial. Assuming a forfeiture is deemed to have occurred, however, Rule 52(b) permits the court to notice, and correct, any prejudice flowing therefrom.

B.   Challenge to Griffith

1. Governing Law

Defendants primarily contend that Griffith's answers during voir dire warrant a new trial, inasmuch as he failed to honestly respond to material written inquiries and that accurate responses would have provided the defense valid bases to challenge him for cause.

Juror impartiality is an explicit command found within the Sixth Amendment:

> The Sixth Amendment . . . affords an accused the right to trial by an impartial jury.  As the Supreme Court has observed, a "touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.'"

Conaway v. Polk, 453 F.3d 567, 582-83 (4th Cir. 2006) (citations omitted); Gardner v. Ozmint, 511 F.3d 420, 424 (4th Cir. 2007); Billings v. Polk, 441 F.3d 238, 244 (4th Cir. 2006); Conner v.

Polk, 407 F.3d 198, 205 (4th Cir. 2005) ("Put simply, if 'even one [partial] juror is empaneled' and the death sentence is imposed, 'the . . . [sovereign] is disentitled to execute the sentence.'")(citation omitted); Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002) (same); Fitzgerald v. Greene, 150 F.3d 357, 362 (4th Cir. 1998).

In McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), the Supreme Court was confronted with a situation in which a juror in a civil case failed to "respond affirmatively to a question on voir dire seeking to elicit information about previous injuries to members of the juror's immediate family . . . ." Id. at 549.  The case involved a family whose son was injured in a lawnmower accident.   The sole defendant was exonerated.   The court of appeals reversed on the grounds that the juror's omission had "'prejudiced the Greenwoods' right of peremptory challenge' and that a new trial was necessary to cure this error."   Id. (citations omitted).

The Supreme Court concluded that the plaintiffs were not entitled to "a new trial unless the juror's failure to disclose denied [them] . . . their right to an impartial jury." Id.  It was observed as follows:

One touchstone of a fair trial is an impartial trier of

fact -- "a jury capable and willing to decide the case
solely on the evidence before it."  Voir dire
examination serves to protect that right by exposing
possible biases, both known and unknown, on the part of
potential jurors. Demonstrated bias in the responses to
questions on voir dire may result in a juror being
excused for cause; hints of bias not sufficient to
warrant challenge for cause may assist parties in
exercising their peremptory challenges.  The necessity
of truthful answers by prospective jurors if this
process is to serve its purpose is obvious.

McDonough, 464 U.S. at 554 (citations omitted).  The high Court

further observed, however, as follows:

To invalidate the result of a three-week trial because
of a juror's mistaken, though honest, response to a
question, is to insist on something closer to
perfection than our judicial system can be expected to
give. A trial represents an important investment of
private and social resources, and it ill serves the
important end of finality to wipe the slate clean
simply to recreate the peremptory challenge process
because counsel lacked an item of information which
objectively he should have obtained from a juror on
voir dire examination.

McDonough, 464 U.S. at 555.

In view of these competing considerations, the Supreme

Court set in place the following standard:

We hold that to obtain a new trial in such a situation,
a party must first demonstrate that a juror failed to
answer honestly a material question on voir dire, and
then further show that a correct response would have
provided a valid basis for a challenge for cause. The
motives for concealing information may vary, but only
those reasons that affect a juror's impartiality can
truly be said to affect the fairness of a trial.

McDonough, 464 U.S. at 556 (emphasis supplied).

Our court of appeals has previously applied the

McDonough standard in the context of capital and other criminal

proceedings.  See Gardner v. Ozmint, 511 F.3d 420, 424 (4th Cir.

2007); United States v. Fulks, 454 F.3d 410, 431-32 (4th Cir.

2006); Conaway, 453 F.3d at 582-83; Conner v. Polk, 407 F.3d 198,

205 (4th Cir. 2005); Fitzgerald v. Greene, 150 F.3d 357, 362 (4th

Cir. 1998).  It has additionally concluded that the

McDonough "test applies 'equally to deliberate concealment and to

innocent non-disclosure.'"  Gardner, 511 F.3d at 424 (quoting

Conner, 407 F.3d at 205).

It is also noteworthy that in some of the

aforementioned decisions the court of appeals has suggested a

third component to the McDonough standard.  In Conaway, it was

stated as follows:

> The McDonough test for juror bias is generally
> characterized as having two parts [that is, (1) failure
> to answer a material question honestly, and (2) a
> showing that an honest answer would have resulted in a
> valid basis to challenge for cause].  The inquiry into
> whether a trial's fairness was affected essentially
> constitutes a third part, however, as it must be
> satisfied before the juror's bias may be proven.

453 F.3d at 585 n.20; McNeill v. Polk, 476 F.3d 206, 224 n.8 (4th

Cir. 2007) (King, J., concurring in part) (A petitioner who can

satisfy the first two prongs of the McDonough test is then also

obliged to establish that "the juror's 'motives for concealing

information' or the 'reasons that affect [the] juror's
impartiality can truly be said to affect the fairness of [the]
trial.'") (citing <u>Conaway v. Polk</u>, 453 F.3d 567, 588 (4th Cir.
2006) and <u>McDonough</u>, 464 U.S. at 556)).

Regarding the second <u>McDonough</u> component, it has been
observed that "'[t]he category of challenges for cause is
limited,' and traditionally, a challenge for cause is granted
only in the case of actual bias or implied bias (although a third
category, inferred bias, might also be available)." <u>Jones v.
Cooper</u>, 311 F.3d 306, 312 (4th Cir. 2002).  It has been suggested
though that active concealment of material information during
voir dire is suggestive of bias.  <u>See</u> <u>Conaway</u>, 453 F.3d at 588
(stating "Conaway alleged facts sufficient to establish that
Juror Waddell concealed crucial information in order to serve on
Conaway's jury.  Such 'dishonesty, of itself, is evidence of
bias.')(citing <u>Burton v. Johnson</u>, 948 F.2d 1150, 1159 (10th Cir.
1991) and <u>United States v. Colombo</u>, 869 F.2d 149, 151-52 (2d Cir.
1989) (recognizing that lying during voir dire is inconsistent
with obligation to 'weigh the evidence fairly and obey the
instructions of the court').").

In <u>Jones</u>, the court of appeals addressed a defense
argument that "a sentencing juror lied on a jury questionnaire

and in voir dire, preventing appellant from being able to challenge her peremptorily or for cause." Id. at 309.  The court of appeals observed as follows:

> Misstatements on a jury questionnaire such as those here are troubling, but do not, standing alone, indicate juror bias. As the Supreme Court has instructed, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." McDonough, 464 U.S. at 556, 104 S.Ct. 845. Here, there is no evidence of motive, much less evidence of motive tending to raise questions as to the juror's impartiality.

Id. at 313.

After quoting the McDonough standard in Fitzgerald, the court of appeals also stated an alternative means for challenging a particular juror's fairness:

> Failure to satisfy the requirements of McDonough does not end the court's inquiry, however, when the petitioner also asserts a general Sixth Amendment claim challenging the partiality of a juror based upon additional circumstances occurring outside the voir dire.  As Justice Blackmun emphasized in his concurrence in McDonough, "the Court's holding [did] not . . . foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury." Justice Blackmun explained that
>
>> regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or in exceptional circumstances, that the facts are

       such that bias is to be inferred.

> McDonough, 464 U.S. at 556-57, 104 S. Ct. 845
> (Blackmun, J., concurring); see Smith v. Phillips, 455
> U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)
> (holding that "the remedy for allegations of jury
> partiality is a hearing in which the defendant has the
> opportunity to prove actual bias"); cf. Wainwright v.
> Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841
> (1985) (holding that the defendant bears the burden of
> establishing juror partiality).

Fitzgerald, 150 F.3d at 362-63; United States v. Fulks, 454 F.3d

410, 431-32 (4th Cir. 2006); see also Jones v. Cooper, 311 F.3d

306, 310 (4th Cir. 2002)(stating "The McDonough test is not the

exclusive test for determining whether a new trial is warranted:

a showing that a juror was actually biased, regardless of whether

the juror was truthful or deceitful, can also entitle a defendant

to a new trial.").


## 2. Analysis


       Regarding the first McDonough factor, Griffith failed

to answer multiple, material voir dire questions in an honest

way.  As noted, he conceded, either explicitly or implicitly,

during the evidentiary hearing that he gave inaccurate or false

responses to questions 41, 46, 50, 52, 64, 66, 69, 124(a), and

127, found on the juror questionnaire.

Regarding the second factor, and leaving aside the inaccurate answers relating to jail time, substance abuse, and prior contact with the criminal justice system, it seems equally clear that accurate responses to questions 41 (dealings with the United States Attorney's office), 46 (being accused of or investigated for a crime), 50 (prior questioning by law enforcement), or 52 (involvement in any dispute with the United States), would have resulted in a valid basis to challenge for cause.  Had Griffith responded truthfully to those questions, he would have revealed that he was under continuing suspicion for having violated multiple federal proscriptions relating to child pornography, not to mention the possibility of related state charges of a most serious nature.  Faced with the prospect of qualifying a death juror who was then, so to speak, in the clutches of the prosecutor, it seems apparent both defendants would have aggressively sought his dismissal.  Indeed, it is likely that the United States would have joined the request.[14]

_____

[14]The United States now though lodges essentially two arguments to the contrary.  First, it contends Griffith's actions suggest a desire to avoid embarrassment and not a predisposition favoring the prosecution.  Second, relying upon precedent from our court of appeals, the government asserts a juror's contact with the criminal justice system "'does not give rise to an inference that the juror was biased against the . . . [accused]; indeed, arguably, the more common-sense assumption is that a juror with this background would be biased in favor of the

(continued...)

From an objective standpoint, it would have been unthinkable to permit him to serve.

While the factual predicate differs in some respects, the United States Court of Appeals for the Fifth Circuit has previously observed the seriousness of allowing a juror to serve on a case involving the same prosecutor who might later charge and prosecute the juror.  In <u>Brooks v. Dretke</u>, 418 F.3d 430 (5th Cir. 2005), a jury member, Garcia, that had previously served on a jury that found defendant Carl Brooks guilty was arrested on the first day of the sentencing phase of Brooks' case for unlawfully carrying a weapon.  The juror would have been subject to prosecution by the same district attorney's office then prosecuting Brooks.  The juror was found to be in possession of a loaded pistol at a security checkpoint in the courthouse, which

---

[14](...continued)
accused.'"  (Govt.'s Resp. at 11 (quoting <u>Jones</u>, 311 F.3d at 313)).  This concededly "arguabl[e]" proposition stated in <u>Jones</u> is not there advanced in a setting where, as here, the accused juror is facing prosecution by the very same prosecution office that is seeking his assent to a guilty verdict and a sentence of death as to each defendant.

Neither argument meets the concerns expressed herein.  For example, Griffith was in effect assured at question 125 of the juror questionnaire that he could confer privately with the court and counsel about such a matter as the United States' investigation of him.  Second, the analysis in <u>Jones</u> does not contemplate a self-interested juror suppressing the fact that the prosecutor trying the case has under consideration the pursuit of the most serious of charges against the juror.

he planned to deliver to a repair shop.  The juror had not

informed his fellow jurors of his arrest and advised the court

that his arrest would not interfere with his ability to be fair

and impartial.  Judge Higginbotham, writing for the panel, noted

additionally as follows:

> At no point did Garcia have any off-the-record
> conversations with members of the District Attorney's
> Office regarding the disposition of his case. Garcia
> did not vote at the punishment phase in a fashion
> designed to ingratiate himself with the District
> Attorney's Office in hopes of obtaining some species of
> leniency in the future.
>
> Garcia related that his vote to assess the death
> penalty upon the applicant, was based solely upon the
> evidence presented during the course of the trial and
> was wholly unrelated to the charge pending against him.
> Garcia had no contact with any members of law
> enforcement regarding his charge, with the exception of
> the arresting officer.

Id. at 432.


Despite these observations in mitigation, some of which

run to the contrary as they relate to Griffith, Judge

Higganbotham concluded as follows on the issue of implied bias, a

juror disqualification doctrine reserved for the most obvious

instances of putative juror partiality:

> Our question is whether . . . [the juror's] conduct is
> of the genre of cases Justice O'Connor pointed to in
> her concurring opinion in Phillips: juror conduct not
> salvageable by post event hearings.  We think that the
> answer to this question is yes.  Garcia was married
> with two young children. As he listened to the evidence
> in the sentencing phase and participated in the jury's
> decision of the State's contention that Brooks should

61

be put to death he was facing a stunning turn of events in his own life. He could have been sentenced to a year in jail; worse yet, he could have faced a felony prosecution, notwithstanding the State's interpretation in this case of the older version of the Texas gun possession statute.  True enough he was not an employee of the district attorney's office, but in practical ways his future was even more in its hands. Garcia testified that the sentencing hearing "was one entire week of hell" and he suffered "unrelenting embarrassment." He thought the matter of his arrest was to be held in confidence, but his "name and this case [was] the head story at twelve, five, six and ten o'clock for four straight days."

We do not suggest that being charged with unlawfully carrying a weapon alone disqualified Garcia for jury service under state law or that any outstanding misdemeanor charge should support a finding of implied bias. It is rather the sum of all factual circumstances surrounding this juror -- in particular, the power of the District Attorney, and the timing and sequence of events -- that compels this conclusion. As Lord Coke put it, a juror must be as "indifferent as he stands unsworn." That there is no evidence that the District Attorney did anything to exploit his power over juror Garcia is of no moment.  That the power presents an intolerable risk of working its will without the raising of a hand or a nod is the vice here.

Id. at 434-35 (emphasis supplied) (footnotes omitted).  The decision in Brooks illustrates why the second McDonough factor is satisfied here, along with the further observation that defendants' invocation of the implied bias doctrine, though rarely successful in the mine run of cases, is appropriately considered here as well.  See Brooks v. Dretke, 444 F.3d 328, 332 (5th Cir. 2006) (opinion denying rehearing by panel and en banc,

observing "The state court concluded that the events surrounding the arrest of juror Garcia, during Brooks's capital-murder trial, were not sufficient to imply bias.  We disagree.  Juror Garcia was arrested and booked for carrying a loaded, .25 caliber pistol into the courthouse on the day Brooks's sentencing hearing started.  Facing the possibility of felony prosecution, Garcia's fate rest in the hands of the same prosecutor now seeking the death penalty in Brooks's trial.  Throughout sentencing, Garcia never knew whether he would be prosecuted. . . . <u>The prosecutor's power over Garcia presented an intolerable risk, one that denied Brooks his constitutionally entitled impartial jury, and we maintain that no reasonable jurist could disagree with our legal conclusion</u>.") (emphasis supplied); <u>Remmer v. United States</u>, 350 U.S. 377, 381-82 (1956) (involving a bribe attempt on a juror, who reported the encounter to the judge, with the judge reporting the matter to the FBI and an FBI agent interviewing the juror during the time of the juror's service and Supreme Court concluding a new trial was warranted, in part, because "[a]s . . . [the juror] sat on the jury for the remainder of the long trial and as he cast his ballot, . . . [he] was never aware of the Government's interpretation of the events to which he, however unwillingly, had become a party.").[15]  That conclusion is

---

[15]Our court of appeals has treated Justice O'Connor's concurring opinion in <u>Smith v. Phillips</u>, 455 U.S. 209 (1982), as the authoritative source regarding the proper reach of the
(continued...)

significant in view of binding precedent.  See, e.g., Conner, 407

F.3d at 205 (4th Cir. 2005) ("Put simply, if 'even one [partial]

juror is empaneled' and the death sentence is imposed, "the State

is disentitled to execute the sentence.") (brackets in original)

(quoting Morgan v. Illinois, 504 U.S. 719, 728 (1992)); Jones,

311 F.3d at 310 (same).

        The third and final inquiry under McDonough is whether

the juror's motives for concealing information or the reasons

that affect his or her impartiality can truly be said to affect

the fairness of the trial.

---

[15](...continued)
implied bias doctrine.  See, e.g., Conaway v. Polk, 453 F.3d 567,
587 n.21 (4th Cir. 2006) ("We have consistently treated Justice
O'Connor's concurrence in Smith as the authoritative articulation
of implied bias.").  Justice O'Connor observed as follows in
Smith:

> While each case must turn on its own facts, there are
> some extreme situations that would justify a finding of
> implied bias. Some examples might include a revelation
> that the juror is an actual employee of the prosecuting
> agency . . . . Whether or not the state proceedings
> result in a finding of "no bias," the Sixth Amendment
> right to an impartial jury should not allow a verdict
> to stand under such circumstances.

Smith, 455 U.S. at 222 (O'Connor, J., concurring) (emphasis
supplied).  The apparent justification for a finding of implied
basis in the situation underscored above is that the prosecuting
authority is vested with a measure of control over the juror that
would objectively suggest an intolerable effect on the juror's
impartiality.  The same would appear to be true in a situation in
which the prosecuting authority possesses the power to prosecute
the sitting juror for a most serious offense.

Despite Griffith's testimony at times trying to minimize his concerns about the investigation, he was the subject of an undeniably serious matter.  A United States Magistrate Judge issued a search warrant for his home, authorizing the seizure of materials related to child pornography.  Eleven federal and state law enforcement agents executed the warrant and seized a great deal of property.  Following receipt of his Miranda warnings the same day, Griffith was interviewed at a law-enforcement office at some length by an FBI agent and a United States Postal Inspector.  He confessed at that time that the questions asked of him by law enforcement "really" made him "nervous."  (Offic. File of the FBI at 32).  He conceded as well at that time that there was "a 'possibility' he downloaded images of post-pubescent 'kids maybe 15' years old."  (Id. at 33).  He also admitted taking pictures of a minor, aged 17, who had an erection at the time, which "he may have sent . . . to" another individual.  (Id.)  On February 19, 2004, he further admitted to S/A DiVittis that "he copied pornographic movies involving boys between the ages of 16 - 18 after viewing movies on approximately ten occasions."  (Offic. File of Spec. Agent at 232).  As noted, S/A Divittis apparently characterized this particular information as a "Pre-Test Confession[.]"  (Id.)

On October 28, 2003, Griffith received a target letter, hand delivered by an FBI agent, advising him that he was "a target of a grand jury investigation." (Id. at 4). He then met with the assigned AUSA and an FBI agent, at which time he was advised that child pornography had been found on his computer. He then failed a polygraph examination and was informed of the results by the FBI that same day. Then, on the eve of deciding whether the defendants should be put to death, he was contacted by the FBI concerning the dormant investigation.[16]

The United States recognized candidly at an earlier juncture that a charge related to child pornography "is a very volatile crime and can bring a person into severe disrepute in

---

[16]It is noteworthy that Remaley and Griffith disagree respecting the timing and substance of this communication. Remaley suggests Griffith phoned him at 7:45 a.m. after Remaley left a note at Griffith's home the day prior. During that conversation, Remaley asserts that he "told Griffith they were not going forward with the case . . . ." (Int. Summs., Ex. E. at 4). While he had difficulty recalling the timing, Griffith suggested he returned Remaley's call "[s]ometime maybe in the midafternoon." (12/18 Trans. at 110). Griffith further testified that Remaley "didn't say anything about the investigation" and that Griffith was never specifically advised that the investigation was over. (Id. at 132).

The actual state of affairs is immaterial in the context of a bias determination. If Griffith was informed the investigation was over, he was beholden to the United States for lifting an immeasurable burden from him on the eve of deliberations concerning the penalties to be imposed on defendants. If Griffith was not so advised, he deliberated under the specter of a sovereign poised to charge him with the most serious of criminal offenses.

his community." (12/13 Trans. at 19).  The court agrees.  It is difficult to imagine one guilty or innocent of such a charge having the ability to set aside the natural fear and turmoil confronted when facing a potential public accusation of misconduct so serious.

In the face of these rather ominous developments, Griffith contended that he "was very fair and impartial" during his jury service.  (Id. at 162).  That representation must be dismissed as hollow.  When further asked if he "were on trial for" his "life, would . . .[he] want a juror who was being investigated by the same prosecuting office to be on the jury[,]" he responded "Probably not."  (Id.)  When asked if he was "concerned every day . . . [when he came to court] that somebody might say something about the [child pornography] investigation," he responded "I guess it was in the back of my mind . . . ." (12/18 Trans. at 116).

One would reasonably expect a juror faced with these compromising circumstances to entertain a number of thoughts impacting his impartiality.  First, he might misguidedly think he could please the sovereign concerning the ongoing investigation of him if a prosecution verdict was returned.  Second, he might think he would have increased leverage in avoiding prosecution

once the prosecutor made the link between the ongoing investigation and his jury service. Third, he might wholly misinterpret as a "wink and a nod" the contact during trial by the FBI suggesting the imminent, and long-awaited, return of his computer.

It is, accordingly, not difficult to conclude that Griffith was motivated to conceal the child pornography investigation in order to diminish the chances of, or avoid altogether, any further investigation or prosecution on charges carrying such extraordinary public opprobrium. The looming potential of further investigation or prosecution -- by the very same entity charged with prosecuting defendants Lecco and Friend -- resulted in a burden on Griffith's impartiality that can fairly be said to have affected the fairness of the trial and sentencing hearing.

Based upon the foregoing, the court ORDERS that the defendants' second motion for new trial be, and it hereby is, in the interest of justice, granted. It is further ORDERED that a new trial be, and it hereby is, granted as to both defendants on all counts.

The Clerk is directed to file this written opinion and order initially under seal pending further order and to forward copies only to counsel of record for the United States and the defendants, with appropriate guarantees of confidentiality.

DATED:  May 4, 2009

John T. Copenhaver, Jr.
United States District Judge