UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**UNITED STATES OF AMERICA**

**v.**     CRIMINAL ACTION NOS. 2:05-00107-01

**GEORGE LECCO**

MEMORANDUM OPINION AND ORDER

Pending are defendant George Lecco's motion for change of venue, filed August 12, 2009, and motion to bar the death penalty due to victim related racial and gender discrimination or, in the alternative, for discovery, an evidentiary hearing and other relief such as the exclusion of "victim impact" evidence and/or testimony before the jury and appropriate instructions ("motion to bar the death penalty or for discovery"), filed August 12, 2009.

I. Change of Venue

Defendant Lecco observes that media coverage of this action commenced in early 2005, with stories appearing daily at certain points.  He attaches and quotes articles appearing in The

Logan Banner, The Charleston Daily Mail, The Charleston Gazette, and The Williamson Daily News.  In particular, defendant notes news accounts describing the victim's death in graphic detail, "including accounts of how 'Lecco and [co-defendant Valeri] Friend' beat and tortured Collins before her death."  (Defs.' Mot. at 3).  A brief summary of the media accounts identified by defendant follows:

1. October 2005: A detailed news account noted that the grand jury had alleged that "Lecco . . . paid Friend to torture the informant and helped her while she 'intentionally inflicted bodily injury that resulted in [the] death'" of the victim.

2. December 2005: Details of the murder, including accounts of the victim asking to pray before she was killed.

3. December 2005: Details concerning the "gruesome" nature of the scene, with Friend allegedly beating Collins with the rock and hammer while Collins pleaded for her life.

4. December 2005: Details concerning an interview with Carmella Blankenship wherein she claimed Patricia Burton told her that defendant Lecco would kill anyone who discussed the murder.

Beyond this coverage in 2005, however, defendant also asserts that media treatment continued during 2006 and through the trial in 2007 "chronicl[ing] every step of the investigation of a missing person, the location and recovery of Collins' body, the various arrests and statements made during the murder investigation, and" so forth.  (Defs.' Mot. at 4).  Defendant

2

notes in particular the following observations from the victim's mother following the trial:

> [O]n May 31, 2007, just two days after the jury recommended the death penalty, the Charleston Gazette ran an article entitled "Victim's mother supports death for pair in informant's killing/woman once considered two as friends." In the article, Collins' mother spoke out about the method of execution facing Lecco and Friend, proclaiming her belief that it (lethal injection) "should be a whole lot harsher." The article then recounted with specificity the details of Collins' death and her mother's statement that it was "tough to hear testimony that Friend had mocked her daughter when she asked to pray while bleeding from the gunshot wound." In the same article, a spokesperson for the government explains how the Department of Justice approves the death penalty in only the most egregious cases.

(Id.) Defendant additionally points out blogging about the case over the Internet,[1] while conceding that "the coverage . . . over

---

[1] For example, a December 2005 post by one anonymous writer stated as follows:

> George Lecco and his kind are the vile evil men who have made a life out of vampiring off the souls of young girls like Carla and his own daughter, whom I have [sic] sadly can admit to partying with many years ago. Unable and unwilling to earn a decent living he turned to destroying lives to feed his own evil desires and make fat [h]is putrid belly by sucking hope from people and replacing hope with the false god of 'getting high.' Unfortunately, Carla fell for his lie and when she tried to make her escape by helping law enforcement -- she paid with her life. She paid with a slow gruesome death and a shallow grave that is much better suited for Lecco and his powder snorting cronies. Her kids now have no mother while he bargains for his life. May his legal jousting end with a faulty electric chair that slowly fries his --- from the inside out.

(Id. at 5 (citation omitted)).

the two years following the verdict and post-trial motions has not been as regular . . . ." (Id.).[2]

In addition to summarizing the extensive media coverage of the case, defendant retained Global Strategy Group to conduct a telephonic survey of residents in the Northern and Southern Districts of West Virginia and the Western District of Virginia. He summarizes the results of that survey as follows:

> Almost 20% of the SDWV residents polled believe that Mr. Lecco is guilty of murder. The survey revealed that those familiar with the case are more likely to believe that Lecco is guilty than those unfamiliar with the case. Of those polled in the SDWV, 29% recalled a story in the news about the case and a combined 41% had some level of familiarity with the case. Of those who recalled the case, 43% of them believe Lecco is guilty. Given the correlation between familiarity with the case and a belief in guilt, the fact that almost 20% of those polled in the SDWV were aware of the guilty verdict and subsequent death sentence in the case is compelling.
>
> In contrast to the SDWV, of those polled in the two other districts, only 9% were familiar with the story (in the Northern District of West Virginia ("NDWV")) and 7% (in the Western District of Virginia ("WDVa")).
>
> The conclusion of the survey is that a pool of jurors assembled in the SDWV is significantly more

---

[2] Defendant notes as well a June 2008 article in the Sunday Gazette Mail recapping the trial and post-trial developments and, among others, May 6 and June 4, 2009, articles discussing the memorandum opinion and order granting a new trial and the recent Fourth Superseding Indictment alleging that defendant had the victim killed in order to protect a cocaine ring.

likely to know about the case and have an opinion than those polled in the NDWV or the WDVa.

(Id. at 1-2).

In United States v. Higgs, 353 F.3d 281 (4th Cir. 2003), defendant was charged with a number of offenses eligible for capital treatment under the Federal Death Penalty Act of 1994 ("FDPA"), §§ 3591-98.  The defendant moved to change venue, asserting that the extensive media coverage of the case would infringe his right to a fair and impartial jury in violation of the Fifth and Sixth Amendments.  The court of appeals summarized the governing law and the distinction between the presumed and actual prejudice that each might suffice for a venue change:

> As a general premise, a change of venue is warranted when the court is satisfied that there exists in the district where the prosecution is pending "so great a prejudice against the defendant" that "the defendant cannot obtain a fair and impartial trial." Fed.R.Crim.P. 21(a). The determination of whether a change of venue is required as a result of pretrial publicity involves a two-step process. First, the district court must determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted," and, if so, grant a change of venue prior to jury selection. Id.  However, "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself."  [S]ee also United States v. Jones, 542 F.2d 186, 193 (4th Cir. 1976) (noting that cases in which prejudice will be presumed will be rare). Ordinarily, the trial court must "conduct[ ] a voir dire of prospective jurors to determine if actual prejudice exists."  If "voir dire reveals that an impartial jury cannot be impanelled," the trial court

should then grant the motion.

Id. at 307-08 (emphasis supplied) (some citations omitted); see also United States v. Bakker, 925 F.2d 728 (4th Cir. 1991) ("This court has cautioned, however, that "[o]nly in extreme circumstances may prejudice be presumed from the existence of pretrial publicity itself." Instead, a trial court customarily should take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists.  Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified.") (citations omitted).

The decision in Higgs informs the appropriate outcome here with respect to presumed prejudice.  In Higgs, defendant asserted that there was a "volume of news media coverage that occurred during the four-plus years that elapsed between the time of the murders and the time that jury selection began in his case."  Higgs, 353 F.3d at 308.  Higgs and a fellow defendant were the first defendants in the Greenbelt Division to face a capital trial.  An associate of theirs had also just been tried and convicted on the same murder charges.  News accounts released just prior to that associate's trial recounted the associate's claim that Higgs ordered the murders.  Both the associate and

6

Higgs were described as local drug dealers serving federal time for controlled substance offenses. Additionally, 130 prospective jurors, and seven who were seated, had read or heard about the case.

As in Higgs, the court cannot conclude that the media coverage here, which has substantially diminished over the course of the past two and one-half years since the first trial, is so inherently prejudicial that a taint must be presumed. The extreme circumstances necessary for granting a change of venue under this first step in the analysis are thus absent.

The survey of the jury pool does not change the outcome. Fully 65% of the survey respondents reported that they were "Not that familiar" (14%) or "Not familiar at all" (51%) "with a story in the news about the murder of a woman named Carla Collins in Minto County . . . that took place in 2005." (Ex. 1 at 4, Defs.' Mot.). Regarding question 10X, 76% of the survey respondents had never heard of Valeri Friend and 79% answered likewise as to George Lecco.

Accordingly, a definitive resolution of whether a venue change is warranted must await voir dire. The nature and timing of the media coverage, and the survey outcome, indicate that care

7

will be warranted during that process to ascertain if actual prejudice exists on an individualized basis.  Inasmuch as a basis for presumed prejudice is lacking, the court, accordingly, ORDERS that the motion for change of venue be, and it hereby is, denied without prejudice to its renewal at the appropriate time during voir dire.

II.  Motion to Bar the Death Penalty or For Discovery.

Defendant Lecco asserts that "any death sentence in this matter will be the product of emotion, not rationality, and present a clear danger that the race and gender of the victim is an 'arbitrary' factor which influenced that decision."  (Mot. at 1).  He requests the following relief:

> [T]hat the Court bar the death penalty. In the alternative, the defendant[] request discovery and an evidentiary hearing and/or a retrial without victim impact evidence and/or with testimony regarding other cases where the death penalty was not sought or obtained and/or with testimony regarding the race and gender of victim effect and/or with testimony about other similar cases and the race and gender of victims in other cases with appropriate instructions and/or with other procedures designed to avoid prejudice and passion and the arbitrary factor of the race and gender of the victim.

(Id. at 7).

In its April 5, 2007, memorandum opinion and order, the court concluded as follows:

8

> **Defendants also contend the FDPA is unconstitutional inasmuch as it is applied disproportionately to those accused of killing white and female victims. In the alternative, defendants request discovery and an evidentiary hearing to develop and examine statistical data. The defendants' argument is foreclosed by, inter alia, McCleskey v. Kemp, 481 U.S. 279 (1987) and United States v. Armstrong, 517 U.S. 456, 483 (1996).**

United States v. Lecco, No. 2:05-00107, 2007 WL 1074775, *2 at n.1 (S.D. W. Va. Apr. 5, 2007).

Defendant now asserts that he is offering "detailed gender related victim evidence [that] . . . has not been presented to any court before this one." (Def.'s Memo. in Supp. at 3); see also id. at 15) ("Although the significance of victim race in death sentencing outcomes has been discussed for at least twenty years, very little prior research has examined whether the combined effect of victim race and gender affects sentencing outcomes in capital cases. This area has only recently gained the attention of researchers.").

The data supporting the statistical analysis is taken from approximately 403 completed federal death penalty cases with race and gender information as to each defendant and victim. The thrust of defendant's argument is that candidates for federal capital punishment who are accused of the murder of a white female are three times more likely than other federal capital candidates to be sentenced to death.

The statistical expert responsible for the research underlying defendant's motion, Dr. Lauren C. Bell, opines that "'this correlation between white female victims and death sentencing is highly statistically significant, systemic, and not the result of chance.'" (Id. (citation and emphasis omitted). She further states that "there is an 'essentially zero' or 'one in one thousand' chance that the race and gender of the victim is not related to the capital sentencing outcome." (Id.)

With respect to the request that the capital sanction be barred in this action, in McCleskey v. Kemp, 481 U.S. 279 (1987), the Supreme Court confronted "whether a complex statistical . . . [analysis known as the Baldus study] that indicates a risk that racial considerations enter into capital sentencing determinations proves that petitioner['s] . . . capital sentence is unconstitutional under the Eighth or Fourteenth Amendment." Id. at 283. With respect to the Fourteenth Amendment claim, which focused on the Equal Protection Clause, McCleskey asserted, inter alia, that "persons who murder whites are more likely to be sentenced to death than persons who murder blacks . . . ." Id. at 291.

Assuming the statistical validity of the underlying study, the Supreme Court nevertheless concluded that the claim

10

failed. Specifically, the Supreme Court observed that the Baldus study, as intricate and detailed as it was, was nevertheless insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose.[3]

With respect to the Eighth Amendment challenge, the Supreme Court concluded as follows:

> Because McCleskey's sentence was imposed under Georgia sentencing procedures that focus discretion "on the particularized nature of the crime and the particularized characteristics of the individual defendant," we lawfully may presume that McCleskey's death sentence was not "wantonly and freakishly" imposed, and thus that the sentence is not disproportionate within any recognized meaning under the Eighth Amendment.

Id. at 308 (citations omitted).

---

[3]The conclusion was especially significant inasmuch as the scope and design of the Baldus study eclipses the far more limited analysis offered by defendant. The Baldus study was composed of two "sophisticated" statistical inquiries examining over 2,000 murder cases in Georgia in the 1970s. The study observed that those accused of killing whites received the death penalty in 11% of the cases while others accused of murdering African-Americans faced the ultimate sanction only 1% of the time. The Supreme Court observed additionally as follows:

> Baldus subjected his data to an extensive analysis, taking account of 230 variables that could have explained the disparities on nonracial grounds. One of his models concludes that, even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks.

Id. at 287.

11

Following the decision in McCleskey, those courts addressing its analysis have characterized the case as providing very little flexibility for challenges to capital sentencing laws based upon statistical evidence. See, e.g., Blanco de Belbruno v. Ashcroft, 362 F.3d 272, 282 (4th Cir. 2004) (citing McCleskey as "holding in the context of capital sentencing that inferences from statistics are of doubtful relevance to the infinite fact variations of individual cases . . . ."); Bell v. Ozmint, 332 F.3d 229, 239 (4th Cir. 2003)("In McCleskey, the Court 'set forth very exacting standards for entitlement to constitutional relief based on statistical evidence of race-of-defendant and race-of-victim effects.' The Eisenberg study, which suffers from some of the shortcomings we identified in [an earlier case], does not constitute 'the exceptionally clear proof' demanded by McCleskey."); United States v. Sampson, 486 F.3d 13, 26 (1st Cir. 2007).[4]

---

[4]Defendant attempts to distinguish McCleskey based upon, inter alia, the considerations that (1) the case was decided after discovery and an evidentiary hearing below, (2) here, unlike McCleskey, there is but one decision maker, namely, the Attorney General, and (3) the FDPA explicitly seeks to ensure that a capital sentence, when rendered, is imposed without regard to race or gender. Assuming the accuracy of these proposed distinctions, they do not warrant a departure from the demanding analysis found in McCleskey. There is no indication that the decision in McCleskey would have been different had it possessed these distinguishing characteristics. The court, accordingly, is bound to apply the governing standard found in McCleskey until instructed to do otherwise by the Supreme Court.

The statistical analysis offered by defendant likewise lacks the degree of proof necessary to justify an absolute bar on the capital sanction based upon victim-based gender and race discrimination. Whether viewed as a Fifth or Eighth Amendment challenge, McCleskey and its progeny counsel against reconsideration of the court's earlier ruling that rejected defendant's request to absolutely bar the capital penalty.

Regarding the request for discovery, the inquiry is controlled by United States v. Armstrong, 517 U.S. 456 (1996), and no less demanding. In United States v. Wilson, 262 F.3d 305 (4th Cir. 2001), a case relying upon Armstrong, our court of appeals reiterated the exceptionally high standard governing discovery of the type sought by defendant:

> Because of th[e] necessary presumption of prosecutorial regularity, a presumption of vindictive prosecution, or any other type of selective prosecution, must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity. Indeed, even before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct. The standard is a "rigorous" one. . . . [Armstrong, 517 U.S.] at 468 . . . . As we summarized the standard more fully in United States v. Olvis:
>
> > Just as the standard for ultimately proving a selective prosecution claim is a rigorous one, so too is the evidentiary threshold for obtaining discovery from the government to support such a claim. A significant barrier

13

>    to discovery is necessary because discovery
>    "imposes many of the costs present when the
>    government must respond to a prima facie case
>    of selective prosecution"; it diverts
>    governmental resources and discloses
>    prosecutorial strategies.
>
> 97 F.3d 739, 743 (4th Cir. 1996) (quoting Armstrong,
> 517 U.S. at 464, 116 S.Ct. 1480) . . . .

Id. at 315-16.

More recently, in United States v. Khan, 461 F.3d 477 (4th Cir. 2006), the court of appeals observed as follows:

> In order to obtain discovery on a selective prosecution claim, a defendant must make "a credible showing of different treatment of similarly situated persons." [Armstrong, 517 U.S.] at 470 . . . . This showing "should itself be a significant barrier to the litigation of insubstantial claims." Id. at 464 . . . . In deference to executive discretion, we have held that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."

Id. at 498.[5]

---

[5]To the extent defendant would assert that a different standard should apply in the context of the Attorney General's decision to certify defendants for capital treatment, the Supreme Court has suggested otherwise in a per curiam decision. In United States v. Bass, 536 U.S. 862 (2002), the United States filed a notice of intent to seek the death penalty. The target of the notice, an African-American, alleged that the decision was motivated by race. He moved to dismiss the notice and, in the alternative, for discovery of information relating to the United States' capital charging practices. Relying upon Armstrong, and the standards found in the body of this memorandum opinion and

(continued...)

Dr. Bell's five-page affidavit focuses on the race and gender of the various victims in the cases analyzed.  The document does not examine the nature and circumstances of the particular defendants who comprise the data set or the nature of the crimes of which they were accused.  It appears that quite a bit of this missing information resides in the public domain, including indictments, substantive pleadings, notices of intent to seek the capital penalty, and interviews with defense counsel. Indeed, the Declaration of the Director of the Federal Death Penalty Resource Counsel Project ("FDPRC"), attached as an exhibit to the motion to bar the death penalty or for discovery, reflects that this type of material is gathered in the ordinary course by the FDPRC.

It is this type of detailed, defendant- and crime specific information that might offer the beginnings of a showing that those in the data set are, or are not, similarly situated to defendant.  Absent this information, however, it is impossible to determine if persons similarly situated to defendant were treated

---

[5](...continued)
order, the Supreme Court concluded that a nationwide statistical study offered by the defendant was of little assistance inasmuch as "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."  Id. at 864.

differently from him, namely, that their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them. The court, accordingly, concludes defendant is not entitled to discovery respecting his selective prosecution claim.[6]

Based upon the foregoing, the court ORDERS that defendant Lecco's motion to bar the death penalty or for discovery be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to the defendant and all counsel of record.

DATED: October 15, 2009

John T. Copenhaver, Jr.
United States District Judge

---

[6] Alternatively, defendant seeks two additional forms of relief. First, he requests a retrial without victim impact evidence. Inasmuch as the Supreme Court has specifically permitted such evidence in the capital context, the court is obliged to decline the request. Second, he seeks permission to essentially offer at trial some or all of the data underlying Dr. Bell's statistical analysis. While the court need not definitively resolve the matter at this stage of the case, that type of evidence would appear to contravene, inter alia, Federal Rules of Evidence 401 and 403.