IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                        CRIMINAL NO. 2:05-00107-01

GEORGE M. LECCO
        also known as "Porgy"

RESPONSE OF THE UNITED STATES TO DEFENDANT LECCO'S
MOTION IN LIMINE AS TO PATRICIA BURTON

Introduction

Comes now the United States of America by Philip H. Wright, Assistant United States Attorney for the Southern District of West Virginia, and files this response to defendant George Lecco's Motion in Limine as to Patricia Burton and Memorandum in Support Thereof. The motion should be denied. Lecco's argument to bar Patricia Burton from testifying is without merit. He cites to cases about witness competency that do not support his position, and ignores the abundant evidence that corroborated much of Burton's testimony. He resorts to arguing that because the death penalty is such an extraordinary punishment, extraordinary measures are required to safeguard his rights, measures that would include precluding the jury from hearing important, admissible testimony against him. Ironically, while Lecco accuses the government of improperly questioning Ms. Burton and thus placing him in a position where it might have appeared to the jury that he was

hiding something if he objected,[1] Lecco now actually wants to hide relevant testimony from the jury.

Lecco's alternative argument, for an order requiring the government to follow the Rules of Evidence and to tape record pre-trial meetings with Burton, is also flawed. The government's questions of Burton in the first trial were proper. Lecco overlooks pre-trial statements by Burton that clearly provided a more than sufficient foundation for the government's questioning of her. His request for an order-in-limine should be rejected, as it is not supported by the record from the trial in 2007 or what is likely to happen at the upcoming trial.

## **Analysis**

### 1. Patricia Burton is Competent to Testify as a Witness.

Lecco argues that Burton cannot meet basic competency requirements due to mental disability, memory problems, and unreliability. He asserts that those impairments render Burton incapable of accurately recalling events and that he will therefore be deprived of his constitutional right to confront her. Lecco, however, fails adequately to analyze the law regarding the competency of witnesses.

---

[1]Lecco states, "The onus should not be on the defendant to object -- suggesting that the defense is trying to hide something - in order to have the government conduct a proper examination, especially with a loose canon [sic] like Ms. Burton." Lecco Motion at 9.

Rule 601 of the Federal Rules of Evidence states clearly in its opening sentence: "Every person is competent to be a witness except as otherwise provided in these rules." These are not empty words. The law presumes that *everyone* is competent to testify, except in limited circumstances. United States v. Lightly, 677 F.2d 1027, 1028 (4th Cir. 1982). The exceptions are limited to cases where it can be shown "that the witness does not have personal knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully." Id. Moreover, even the latter two exceptions are to be applied rarely. For example, in Lightly, the court held that it was "clearly improper" for the trial court to disqualify a proffered defense witness even though the witness had been found to be criminally insane and was subject to hallucinations. Id.

In United States v. Odom, 736 F.2d 104 (4th Cir. 1984), the court further expounded on Rule 601 and the competency of witnesses. The court explained that the Rule represented the culmination of a modern trend "which has converted questions of competency into questions of credibility while 'steadily moving towards a realization that judicial determination of the question of whether a witness should be heard at all should be abrogated in favor of hearing the testimony for what it is worth.'" Id. at 112 (citing 3 Weinstein's *Evidence*, Witnesses §601[5], p.601-37). Thus,

"[n]either feeble-mindedness [nor] insanity renders a witness incompetent or disqualified." Id.

In Falwell v. Flynt, 797 F.2d 1270 (4th Cir. 1986), rev'd on other grounds Hustler Magazine v. Falwell, 485 U.S. 46 (1988), the court reinforced the principle that a witness should be disqualified under Rule 601 only in rare cases and only where the judge finds that "because of the witness' infirmities, the proffered testimony fails to meet the relevancy requirements of Rules 104(b), 401 and 403." Id. at 1277. Thus, the pertinent question now is not whether a witness should even be heard, but whether the witness should be believed. See id. The court also pointed to The Notes of Advisory Committee on Proposed Rules for Rule 601, which state: "Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." Id.; see also United States v. Allen J., 127 F.3d 1292, 1294, 1296 (10th Cir. 1997)(holding that a party seeking to have a child declared incompetent to testify has a heavy burden to overcome; the fact that a 12-year-old witness suffered from fetal alcohol syndrome and had a learning disability was not enough to overcome this heavy burden; any inconsistencies in the witness' story or problems with her testimony "raise questions of credibility, not competence");

<u>United States v. Hyson</u>, 721 F.2d 856, 864 (1st Cir. 1983) ("There is no provision in the rules for the exclusion of testimony because a witness is mentally incompetent. The question of competency goes to the issue of credibility, which is for the trier of fact.")(citing <u>Lightly</u>, 677 F.2d at 1028).

Lecco ignores the import of these cases. He cites <u>Lightly</u>, but ignores its holding. He also cites <u>United States v. Benn</u>, 476 F.2d 1127 (D.C. Cir. 1973); <u>Doran v. United States</u>, 205 F.2d 717 (D.C. Cir. 1953); and <u>United States v. Ramirez</u>, 871 F.2d 582 (6th Cir. 1989). In each of those cases, however, the witness whose competency was challenged was allowed to testify.[2] On the basis of the law, Lecco's request to bar Burton's testimony should be rejected.

Thus, Lecco's motion to exclude the testimony of Burton should be denied simply on the ground that he has failed to provide any competent support for it. There has been no showing that Burton is

---

[2] <u>See</u> <u>Benn</u>, 476 F.2d at 1129-31 (mentally-retarded 18 year-old prosecutrix, whose father testified that her memory was inconsistent at times and that she did fantasize about inocuous things but never totally fabricated anything, was allowed to testify because she demonstrated an understanding of her duty to be truthful and "a capability" to observe and remember); <u>Doran</u>, 205 F.2d at 718-19 (ten-year old child, sole eyewitness to crime of indecent act on a minor, was allowed to testify after persistent questioning by the trial court elicited information that she knew what it was to tell a story, swore to tell truth and that she would not tell anything that was not the truth, and knew she could be punished for not telling the truth); <u>Ramirez</u>, 871 F.2d at 583-84 (co-conspirator witness, who had been seriously addicted to cocaine and who took the anti-anxiety drug Xanax, was allowed to testify).

incompetent as a witness.[3]  Moreover, there was in this case substantial corroboration for Burton's testimony in many very important respects. Examples of how her testimony was corroborated are listed below:

   *A. Cocaine Distribution.*

   There was substantial evidence corroborating Burton's testimony about selling cocaine for Lecco at the Pizza Plus Restaurant and by delivery, the prices for particular quantities, and Lecco's source of supply for the cocaine. The corroboration included, among other things, a) Anthony Perdue's, Michael Looney's and Cliff Aker's testimony about, and the physical evidence from, controlled purchases of cocaine from Lecco in 2005, which demonstrated that Lecco was in fact a cocaine dealer who dealt cocaine from the Pizza Plus Restaurant, cocaine sold for the prices indicated by Burton;  b) Aker's testimony about Lecco's confession in February 2005, in which Lecco admitted he was a cocaine dealer whose source of supply was Michael Kitchen, the source identified by Burton; c) Kitchen's testimony about supplying cocaine to Lecco; d) Charles Hatfield's testimony that he saw Burton sell cocaine at the Pizza Plus; e) Gary Collins' testimony about the price for an "eight-ball" of cocaine and Burton selling cocaine to him; and f) Walter Harmon's testimony about Lecco selling cocaine, and for the

---

[3]Lecco also misses the obvious fact that the jury in the first trial convicted Lecco on all charges, demonstrating that the jurors found her credible on important issues.

prices Burton related. It is also expected that Valeri Friend will confirm that Burton sold cocaine from the Pizza Plus Restaurant, for the prices indicated by Burton, and that Burton would place cocaine in a potato chip bag when selling it, as Burton described.

B.   *The Murder—-When, Where, Who Was There--And the Cover-up.*

Burton's statements about when the murder of Carla Collins occurred, where it occurred, who was present at the scene of the killing, and aspects of the subsequent cover-up, were also corroborated by the testimony of other witnesses and physical evidence. For example, a) Carmella Blankenship testified about the four women (Collins, Burton, Friend, and Blankenship) driving around and ending up at the abandoned trailer on Double Camp Road and that the shooting occurred there; b) David Chafin testified about seeing Patricia Burton and two other women on Double Camp Road and pulling their car out of a ditch, as Burton testified, on the Saturday morning preceding the Monday when the trailer was burned; c) Walter Harmon testified about digging a grave not far from the trailer, a grave he later learned was for Collins and which Lecco asked him to dig about 10:00 or 11:00 on Saturday morning, April 16, 2005; d) Harmon testified about burning the trailer, again at Lecco's request, which corroborates Burton's testimony about where the murder occurred; e) Perdue testified about the trailer being burned, finding a body in a nearby, shallow grave, and finding a sandal in the grave; f) Hatfield testified

about seeing Collins early in the morning on April 16, 2005, when she left the Pizza Plus with Patricia Burton and Valerie Friend in Friend's car, and Collins' calling his house later in the morning; g) Hatfield testified about taking Lecco to the trailer on Double Camp Road later that night; h) Hatfield testified about Lecco removing his clothing after the burial and giving them to his wife for her to burn; i) Charles Burton testified about being at the scene when Collins' body was moved from the trailer and taken to the nearby grave and that the body would not fit completely in the trunk of Friend's car; and j) Tina Collins, Carla's mother, testified that by Sunday, April 17, 2005, she was very worried about Carla Collins' whereabouts.

All of these witnesses' testimony corroborated things that Patricia Burton said in her testimony about important aspects of the murder and the cover-up. In addition, the parties stipulated that the body in the grave was that of Carla Collins, confirming what Burton said. And physical evidence, such as pictures (of the burned trailer, the body, and the grave), the shovel left on Double Camp, and the sandal left in the grave, further confirmed or buttressed key parts of Burton's testimony.

*C. Why Collins was Murdered--Lecco's Involvement and Motive.*

Burton's testimony about Lecco's involvement in procuring and causing Collins' murder and his desire that she be killed was also corroborated by other evidence. After the search of the Pizza Plus

8

by law enforcement in February 2005 and Lecco had ostensibly agreed to cooperate with government, he nonetheless continued to deal cocaine. Brenda Hinkle confirmed his continued dealing of cocaine after February 2005, as did Michael Kitchen. He thus had something to hide from law enforcement.

Lecco feared informants. The recording from a controlled buy on February 15, 2005, revealed Lecco talking about the sheriff of Mingo County attempting to "run a wire" on Lecco. In addition, numerous witnesses testified about Lecco's fear of informants and, in particular, his suspicion of Carla Collins. The witnesses included Gary Collins (Lecco asked Gary Collins whether he was "narcing" on Lecco and said that "things could happen" if Gary Collins was "narcing," and Lecco said he couldn't trust Carla and that he thought Carla was wearing a wire on him), Walter Harmon (Lecco asked in mid-March 2005 about whether Carla Collins "might roll" on him, Lecco wanted Harmon to kill J.F. Smith because Lecco feared Smith would get him in trouble, Lecco didn't trust anyone in the period leading up to the murder, Lecco said *he* had a problem -- "I have a dead body" -- and "my angels killed her"), Charles Burton (Lecco believed Carla Collins was wearing a wire on him), Michael Kitchen (Lecco said that "Carla was taken care of," and that Lecco was "kind of bragging about it" while smiling and rocking back and forth on his feet), Charles Hatfield (Valeri Friend said she killed Carla Collins because Collins was wearing a wire), and Michael

9

Looney (Lecco was interested in having friends who were friendly with law enforcement so Lecco could learn if the police said anything about him, Lecco was very agitated in a conversation with Looney in which Lecco said somebody was wearing a wire on him, and Lecco brandished a gun and threatened Looney when Looney asked about Carla Collins).[4]

Collins was in fact an informant. Perdue explained that Carla Collins was working for law enforcement as a confidential informant. Perdue also testified that on April 3, 2005, Collins informed on Lecco, telling Perdue about Lecco's continued criminal activity. Also, in late March or early April 2005, Perdue confronted Lecco about his continued cocaine trafficking and informed him that law enforcement would no longer work with him. Thus, Lecco knew then that he would face prosecution without the benefit of any further "cooperation." It is also reasonable to infer that Lecco knew then that information about his ongoing criminal activity after he had ostensibly agreed to cooperate would hurt him.

---

[4]Additionally, at the upcoming trial it is anticipated that Sgt. Perdue will testify that on the night of the search in February 2005, Lecco was skeptical that law enforcement had any controlled buys of cocaine from him. Lecco said he would have known if someone "wore a wire" on him, because he had a device that would detect the transmission of radio frequencies. Unfortunately for Lecco, the recording devices used by Looney during the controlled buys did not transmit any signal. They simply recorded sound (and video in one instance).

In addition to the foregoing evidence, it was plainly apparent from the testimony of the witnesses, as well as their appearance, backgrounds, and demeanor, that Lecco was the mastermind, as it were, of the cocaine dealing at the Pizza Plus Restaurant and the cover-up of the murder. He supplied the cocaine to others and he got others to carry out his wishes. Based on these factors, as well as the evidence noted above, it was not too much for a reasonable juror to conclude, as the original jury did in fact conclude, that Lecco was indeed the mastermind behind the murder -- that he continued to traffic in cocaine in the spring of 2005, that he feared Collins was an informant against him, and that he had her killed as a result.

The discussion above clearly illustrates that there was substantial evidence to support Burton's testimony that Lecco was behind the killing of Collins. There is also little doubt, as Lecco notes, that Burton is a difficult witness. She is not well educated and does suffer from mental impairments (although their extent is not such that she is incompetent to testify). That she was not able to articulate as clearly at trial that which she had earlier stated about Lecco's motive does not make her inherently unreliable as a witness or detract from her standing as a competent witness under the Rules of Evidence. Prior to trial, Burton made statements that clearly indicated Lecco's responsibility and his motive for having Carla Collins murdered. (Copies of Burton's pretrial statements to

11

law enforcement on June 28, 2005, and August 3, 2005, her statements to the Court at her plea hearing, are attached hereto as Exhibits A - C, respectively.) Burton has since stated that she was nervous about testifying, which was clearly the case given her demeanor at trial. She is expected to testify, again, that Lecco asked her to recruit Valeri Friend to kill Collins. She is expected to testify that Lecco wanted Collins killed because she was working with law enforcement. There is much to substantiate such expected testimony, as noted above. Lecco's claim that Burton does not have the capacity to recall, that she confabulates by reciting imaginary events, and has no assurance of reliability, is blatantly wrong.[5]

Lecco nonetheless makes much of inconsistencies and contradictions in testimony. It would be the rare trial, however, that did not have inconsistencies and contradictions in and between witnesses' testimony. It would be even rarer to have such a trial in a case involving a sordid, heinous crime with witnesses who are capable of murdering, and did in fact murder, another human being. But Lecco goes further, claiming that Burton's testimony about the killing of Carla Collins was "unquestionably false." Lecco Motion

---

[5]In another bit of irony, given Lecco's claim now that Burton's testimony has no assurance of reliability, it should be remembered that Lecco himself vouched for a key part of Burton's trial testimony. Lecco, through his counsel during opening statement, admitted to participating in the burial of Carla Collins. He also admitted, through his counsel's closing argument, that he was a drug dealer and that "there was an astounding amount of drugs that went in and out of Pizza Plus."

at 13. He claims that Friend's Stipulation of Facts, filed with her plea agreement, confirms the falsity of Burton's testimony about how Collins was shot (from behind according to Burton). The United States and Friend, however, did not stipulate that Collins was *not* shot from behind. Friend has stated that Collins was indeed shot first from behind, at fairly close range, by Burton. That shot, according to Friend, either barely missed or grazed Collins' head, but in either case, Collins fell over. She was then moved into a bedroom in the trailer while still conscious and able to speak. Friend has also affirmed that she then shot Collins in the chest, while in the bedroom. Thus, Friend's information in fact corroborates the part from Burton's (and Blankenship's) testimony that Collins was shot from behind, as well as testimony about Collins speaking after she was shot and being moved inside the trailer.

Burton and Friend conflict on points. They differ on who fired the first shot from behind and who struck Collins in the head. As noted above, however, differences in the accounts of two witnesses as to what actually happened are not rare and may even be expected when the two witnesses were using cocaine for a number of hours before committing a horrific murder. Differences in accounts may result from lies, or from misrecollection, which can be affected or caused by any number of things, including perception and mental state. As to the difference between Friend and Burton on the issues

13

of who fired the first shot and who hit Collins in the head, one or both may be attempting to minimize their roles in the actual killing. But both have admitted that they are guilty of murdering Collins. And both attribute to Lecco the motive for the killing. The manner and circumstances of the actual execution of Carla Collins are not of paramount importance in resolving the key question of whether Lecco ordered, procured, or caused the execution.

Given what happened at the first trial, with all of the evidence corroborating Burton's testimony, and given what is expected to happen at the upcoming trial (including Friend's expected testimony, as well as that of the other witnesses) the jury should be allowed to hear Burton's testimony and evaluate whether to believe her in light of the entirety of the evidence in the case. It should not be kept in the dark about important, relevant evidence. Whatever problems Burton has with her memory may be explored on cross-examination as going to the weight and credibility of her testimony. This Court should deny Lecco's request that her testimony be kept from the jury.[6]

---

[6]Lecco also claims that the United States is responsible for Burton's testimony. (Lecco Motion at 8.) How so? Clearly Burton and Friend have relevant information. Regardless of any conflicts in their testimony, the jury should hear both in its search for the truth. In fact, if anyone is responsible for Burton being a witness, it is Lecco himself. It was Lecco who associated with her, hired her as his employee in the pizza and drug businesses, and used her to sell and deliver cocaine. It was Lecco who manipulated her, plied her with cocaine and got her to do his bidding. As a

2. <u>No Order-in-Limine Regarding Ms. Burton is Necessary</u>.

Alternatively, Lecco argues for an Order that would bar the United States from "eliciting improper testimony," require the United States to "determine whether the testimony she will provide in the next trial comports with the Rules of Evidence and Due Process," require the United States to instruct Burton to answer the question asked, and require the United States to tape record any interview with her. Lecco Motion at 14-17. Such an order is not necessary and, with respect to the tape recording, unsupported by law or rule.

The United States does not intend to elicit improper testimony. Burton's pre-trial statement attached as Exhibit B to this response clearly demonstrates that Burton indicated she had personal knowledge of Lecco's belief that Carla Collins was cooperating with law enforcement against him. It is anticipated that she will testify that Lecco told her, in effect, that Collins was working with law enforcement against him. It is also anticipated that she will explain, based on personal observation, that Lecco gave two guns to her husband, Charles Burton, who placed them in her car. One of these guns, according to Patricia Burton, was the weapon used to shoot Collins. The United States expects

---

result, she now faces a potential sentence of life imprisonment, hardly a sweetheart deal.

Burton to testify based on personal knowledge and will lay a proper foundation for her testimony.

It bears repeating that Burton is a difficult witness, who is likely to be nervous and anxious about testifying. At the first trial, she appeared to have a tendency, not uncommon with lay witnesses (and even some expert witnesses), to want to explain things that she was not specifically asked about, perhaps with the thought that she might say what she knows as quickly as possible and thus end the ordeal of testifying as soon as possible. The United States has advised her in the past and will advise her again, either directly or through her attorney, to answer the question that was asked and not to go beyond the question. The United States will also follow the Rules of Evidence in asking her questions. It may be necessary to preface certain questions with an explanation that she should not supply an answer based on hearsay and should focus her answer to the question asked. But it also should be recognized that in questioning Burton, leading questions may be completely appropriate. In his criticism of Burton and the United States, Lecco fails to account for numerous cases that establish that the Court may exercise its discretion and allow leading questions of a difficult witness on direct examination.

The Rules of Evidence allow for some latitude in this area.[7]

_____

[7]Rule 611 of the Federal Rules of Evidence states, "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make

The circumstances allowing for such latitude do not necessarily require that the witness be hostile to the government. The Court has the discretion to allow leading questions on direct examination of witnesses who are afraid of testifying, are inarticulate, or who suffer from mental disabilities.[8]

Finally, there is no basis for ordering the United States to order that any future interviews of Burton be recorded. As noted above, Burton's past testimony and her expected testimony will be corroborated in key respects by other witnesses and physical

---

the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). The Rule also provides that "[l]eading questions should not be used on the direct examination of a witness *except as may be necessary to develop the witness' testimony*." Fed. R. Evid. 611(c) (emphasis supplied).

[8]See, e.g., Jordan v. Hurley, 397 F.3d 360, 363 (6th Cir. 2005)(holding that leading questions were permissible under Ohio Rule 611(c), where victim-witness had Down syndrome and had difficulty responding to the prosecutor's questions; and citing to federal cases where leading questions were deemed permissible in direct examination of certain witnesses, including a child sex abuse victim, a foreign witness testifying through a translator, an unusually soft-spoken and frightened witness, and a mentally retarded adult who was the victim of sexual abuse); United States v. Nambo-Barajas, 338 F.3d 956, 962 (8th Cir. 2003)(holding that leading questions on direct examination of government witnesses, both of whom had mental disabilities, were warranted); United States v. Stelivan, 125 F.3d 603, 608 (8th Cir. 1997)(holding that trial court properly allowed government to ask leading questions on direct examination of inarticulate and evasive witness); see also United States v. Durham, 319 F.2d 590, 592 (4th Cir. 1963)(noting that essential test of a leading question is whether it so suggests the specific tenor of a reply that such reply is likely to be given regardless of actual memory, and that  the "evil to be avoided is that of supplying a false memory for the witness").

evidence. Burton's attorney has indicated that he opposes any such requirement. And the recording would represent an unwarranted and unprecedented invasion of the government's attorney work product. The United States is mindful of its duty to disclose materials called for by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and later cases; the Jencks Act, 18 U.S.C. § 3500; the Federal Rules of Criminal Procedure; the Court's Local Rules and the Arraignment and Discovery Order; and the Department of Justice's policy on disclosing exculpatory and impeachment materials. The United States will timely disclose such materials. No additional order is necessary.

Respectfully submitted,

CHARLES T. MILLER
United States Attorney


By:   <u>s/Philip H. Wright</u>
Philip H. Wright, Bar Number: 7106
Assistant United States Attorney
United States Attorney's Office
300 Virginia Street East, Suite 4000
Charleston, West Virginia 25301
Telephone: (304) 345-2200
Fax: (304) 347-5104
Email: <u>Philip.Wright@usdoj.gov</u>

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "UNITED STATES
RESPONSE OF THE UNITED STATES TO DEFENDANT GEORGE LECCO'S MOTION IN
LIMINE AS TO PATRICIA BURTON AND MEMORANDUM IN SUPPORT" has been
electronically filed with the Clerk of the Court on this date using
the CM/ECF system and served upon opposing counsel as follows:

```
        Gerald T. Zerkin
        Amy L. Austin
        Federal Public Defender's Office
        701 E. Broad Street, Suite 3600
        Richmond, VA  23219
        amy_austin@fd.org
        gerald_zerkin@fd.org

        Brian J. Kornbrath
        Federal Public Defender's Office
        230 West Pike Street, Suite 360
        Clarksburg, WV 26301
        brian_kornbrath@fd.org
```

```
                        s/Philip H. Wright
                        Philip H. Wright, Bar Number: 7106
                        Assistant United States Attorney
                        Attorney for the United States
                        United States Attorney's Office
                        300 Virginia Street East, Suite 4000
                        Charleston, West Virginia 25301
                        Telephone: (304) 345-2200
                        Fax: (304) 347-5104
                        Email: philip.wright@usdoj.gov
```

Date: October 22, 2009